Loujen KERPER, Trustee of Kerper Trust No. 1, Appellant (Plaintiff),

Janeen Kerper, Jill Kerper, Ryan Lennon, Colby Lennon and Kara Bereman (Plaintiffs),

v.

Meike KERPER, William Daniel Elsom, Teren Falk, John Kerper Romano, Tina Romano, Stana Milodragovich, Inge Stander and Taimi Alexander, Appellees (Defendants).

Janeen KERPER and Jill Kerper, Appellants (Plaintiffs),

Loujen Kerper, Trustee of Kerper Trust No. 1, Ryan Lennon, Colby Lennon and Kara Bereman (Plaintiffs),

v.

Meike KERPER, William Daniel Elsom, Teren Falk, John Kerper Romano, Tina Romano, Stana Milodragovich, Inge Stander and Taimi Alexander, Appellees (Defendants).

Inge STANDER and Taimi Alexander, Appellants (Defendants),

Meike Kerper, William Daniel Elsom, Teren Falk, John Kerper Romano, Tina Romano and Stana Milodragovich (Defendants),

v.

Loujen KERPER, Trustee of Kerper Trust No. 1; Janeen Kerper; Jill Kerper; Ryan Lennon; Colby Lennon and Kara Bereman, Appellees (Plaintiffs).

Nos. 87–244, 87–245 and 87–246.

Supreme Court of Wyoming.

Sept. 1, 1989.

924

---

Robert James Wyatt of Burgess & Davis, Cody, and Margaret Sommers of McCarty & Cranfill, Cody, for appellant Loujen Kerper.

Tom C. Toner of Redle, Yonkee & Arney, Sheridan, for appellants Inge Stander and Taimi Alexander.

Janeen Kerper, San Diego, Cal., pro se and counsel for appellant Jill Kerper.

Ross D. Copenhaver of Copenhaver, Kahl & Kath, Powell, for appellee Meike Kerper.

Charles G. Kepler of Simpson & Kepler, Cody, for appellees Ryan Lennon, Colby Lennon, Kara Bereman, Teren Falk and John Kerper Romano.

Before CARDINE, C.J., THOMAS, URBIGKIT, and MACY, JJ., and BROWN, J. Ret.

CARDINE, Chief Justice.

This lawsuit began as a declaratory judgment action brought by Loujen Kerper as trustee of the Kerper family trust after bad feelings developed between herself and her sister Meike Kerper about the use of a family cabin. Loujen was the designated trustee of the Kerper trust and was also an income beneficiary of that trust along with her three sisters. The trial court resolved the declaratory judgment action by ordering:

1. That certain surcharges be imposed against Loujen as the original trustee.

2. That a constructive trust be imposed on assets received from the estate of W.G. (Wes) Kerper and that the four Kerper sisters reimburse the Kerper trust for assets received from the Wes Kerper estate.

3. That Loujen Kerper be removed as designated trustee of the Kerper trust and that a corporate trustee be substituted.

The trial court's orders resulted in three separate appeals. In these consolidated appeals we will address the following issues:

I

Did the settlors of the Kerper trust intend to modify the liability of the trustee in the event she mismanaged trust assets?

II

Did Wes and Hazel Kerper execute mutual wills containing an express and enforceable contract for the disposition of their respective estates and if such contract existed did Wes Kerper breach its terms after Hazel Kerper's death?

III

Did the trial court err in removing Loujen Kerper as trustee and replacing her with the First Wyoming Bank of Cody as an independent successor trustee under the terms of the trust?

We reverse.

Hazel and Wes Kerper were both attorneys who practiced law for many years in Wyoming. They had four daughters and ten grandchildren, three of whom were minors at the time of trial.

Between 1965 and 1974, Hazel, Wes and their daughter, Loujen Kerper, executed numerous trust instruments incorporating supplements and amendments, apparently intending to dispose of the Kerper assets under the trusts. The first trust document, executed on September 7, 1965, provided that the corpus of the trust be distributed to the four daughters in equal shares. This trust was to expire by its terms either on September 1, 1967, or upon the death of Loujen Kerper, whichever occurred first. Appellants introduced unrebutted evidence that the original estate plan, as manifested in the 1965 trust, was later changed because of the alcoholism, emotional instability and troubled marriage of one of the daughters.

Hazel and Wes Kerper created other trusts, supplements and amendments between 1965 and 1974.[1] The last trust in-

---

1. In addition to the September 7, 1965 trust and the October 1, 1974 trust Hazel, Wes and their daughter, Loujen Kerper, also participated in the execution of the following documents:

a. A trust executed December 15, 1967, by Hazel and Wes as grantors, and Loujen as trustee, covering assets to be transferred into the trust later. It provided for semiannual distribution of trust income to the four Kerper daughters in equal fourths, and upon the death of any daughter her fourth to go to her children per stirpes. If a deceased daughter died without children then her fourth was to be divided equally among the surviving Ker-

per daughters. Upon the death of the last Kerper daughter to die the trust corpus was to be distributed to the grandchildren per capita.

b. A trust executed May 30, 1972, by Loujen Bereman Kerper as trustee concerning the Husky royalty. This trust made that royalty subject to the same terms of distribution described in paragraph (a) above.

c. A trust executed May 30, 1972, by Loujen Bereman Kerper as trustee concerning royalties accruing to Hazel Kerper on publication of her book titled *Introduction to the Criminal Justice System* (book royalties). This trust provided that Jill Kerper Lennon was to

strument was a document executed October 1, 1974, by Wes and Hazel Kerper, as settlors, and Loujen Kerper, as trustee. This document recited that it superseded the previous trust documents. It contained the same language of disposition found in the September 17, 1973 trust instrument, but added a spendthrift provision and provided that in the event of a vacancy occurring in the position of trustee, a successor trustee would be appointed by the surviving Kerper daughters.

On May 25, 1974, Hazel and Wes Kerper executed mutual wills containing the same terms of distribution for their respective estates. The wills provided that the remainder of their estate be left in trust to the trustee under Kerper Trust No. 1 dated September 17, 1973, to be added to and become part of the corpus of that trust. After October 1, 1974, Loujen Kerper managed the Kerper financial affairs through a single trust, that is, the October 1, 1974 trust document.

Hazel Kerper died on January 17, 1975. On July 22, 1976, the decree of distribution of her estate distributed certain property to Loujen Kerper, trustee of Kerper Trust No. 1.

By the summer of 1980 Wes Kerper had decided to remarry and called a meeting with his daughters in which he informed them that he desired to change his will. On July 15, 1980, an agreement was signed by Wes Kerper and his four daughters. The agreement provided that a will, executed on that date by Wes Kerper, would control the distribution of his property and estate and that the will was made in accordance with the original understanding between Wes Kerper and Hazel B. Kerper as set forth in their 1974 wills. The July 15, 1980 will revoked Wes's 1974 will and provided that upon the death of Wes Kerper, the remainder of his estate would go to his four daughters in equal shares.

Wes Kerper died on June 3, 1981. No contractual claims were filed against the estate by any of the beneficiaries of the trust or by the trustee, and there were no objections made to the petition for decree of distribution. Wes Kerper's estate was distributed in accordance with his will of July 15, 1980, with the residue and remainder of his estate set over to the four Kerper daughters in equal shares. The decree of distribution in the estate was entered on October 21, 1982.

Loujen Kerper proceeded to administer the trust according to the terms of the October 1, 1974 trust agreement. After substantial family disharmony, she filed a complaint in the District Court of Park County, Wyoming, seeking a declaratory judgment that she had acted in accordance with the trust documents in making loans to herself and had otherwise conducted the business of the trust properly. Several beneficiaries of the Kerper Trust filed a counterclaim naming Loujen Kerper in her capacity as trustee as defendant, alleging that she had breached her duties and mismanaged the trust.

After a motion by appellees Teren Falk, John Kerper Romano, Tina Romano, Stana

receive $300 per month beginning September 1, 1972, and ending September 1, 1974. Money remaining after those payments was to be transferred to and distributed in conformance with the terms of distribution in paragraph (a) above.

d. An Amended Declaration of Trust No. 2 executed April 2, 1973, concerning the book royalties. This trust provided for semiannual payments of $1800 to daughter Jill Kerper Lennon through September 1, 1974. Money remaining after those payments up to $5400 annually was to be distributed in three equal shares to the other Kerper daughters. Excess remaining after payment of that $7200 annually was to be transferred to the May 30, 1972 Amended Declaration of Trust No. 1 and distributed according to its terms.

e. An assignment and declaration of trust executed July 11, 1973, by Hazel and daughter Janeen Kerper concerning royalties receivable from publication of a book titled *"Legal Rights of the Convicted"* written by Hazel Kerper. Two-fifths of these royalties were to be held by Loujen Kerper pursuant to the terms of the May 30, 1972 Amended Declaration of Trust No. 1 and distributed according to its terms.

f. Kerper Trust No. 1, executed September 17, 1973, by Hazel and Wes Kerper as grantors and Loujen Kerper as trustee. Provisions of this trust relevant to these cases are quoted later in the text of the opinion.

Milodragovich and Meike Kerper, Charles Kepler was appointed as guardian ad litem for the minor contingent income beneficiaries and remaindermen of the trust. The guardian ad litem filed a counterclaim and crossclaim against the four Kerper daughters alleging that Wes Kerper had breached the contract contained in the 1974 wills by executing his July 15, 1980 will in which he changed the disposition of the assets of his estate. The guardian ad litem sought judgment against the four Kerper daughters requiring them to convey to the Kerper Trust No. 1 all property which they received from the Wes Kerper estate still owned by them, and to pay to Kerper Trust No. 1 an amount equal to the fair market value on October 21, 1982 (the date of the decree of distribution in the Wes Kerper estate) of all property received from the estate of Wes Kerper no longer owned by them.

The guardian ad litem filed a motion for summary judgment on his claims on July 31, 1986. The motion was resisted by the trustee on several grounds including the fact that a claim against the estate arising from a contract to make a will had to be asserted in an independent action against the administrator or executor of the estate and that the beneficiaries had failed to challenge the distribution made in the estate of Wes Kerper in a timely manner.

On September 22, 1986, the court granted the partial summary judgment filed by the guardian ad litem and imposed a constructive trust upon the assets received by the four Kerper daughters from the Wes Kerper estate. The order granting the partial summary judgment left for future determination the amount which the four Kerper daughters would be obligated to reimburse the trust.

After other pretrial motions, including a motion for partial summary judgment by the trustee, the court issued an additional partial summary judgment holding that:

(1) The Declaration of Trust dated September 7, 1965, terminated and became distributable to the four Kerper daughters on September 1, 1967, and that the four Kerper daughters were entitled to a conveyance to them of their undivided one-fourth interest in the Husky oil royalty.

(2) The Amendment to Declaration of Trust No. 1 executed by Loujen Kerper on May 30, 1972, was not effective to amend the 1965 Declaration of Trust because the 1965 declaration had already expired by its terms and because no power to amend or modify had been reserved in the 1965 declaration; therefore, it was irrevocable and not subject to amendment or revocation.

(3) The December 15, 1967 trust instrument was a "dry trust" because no asset or property was transferred to the trust at the time of its execution; therefore, the 1967 trust agreement was invalid for lack of a trust res at the time the trust was created. The court determined that a consequence of failed express trust is a resulting trust held by the trustee for the benefit of the settlors, Wes Kerper and Hazel Kerper. All assets transferred by Wes Kerper and Hazel Kerper between December 15, 1967, and September 17, 1973, were determined by the court to be subject to a resulting trust for the benefit of Wes Kerper and Hazel Kerper. These assets which were held by Loujen Kerper as a resulting trust became subject to and part of the September 17, 1973 trust instrument. The court further found that the Wyoming Principal and Income Act did not apply to the resulting trust or to the receipts and disbursements of the trust.

(4) The Supplement to Kerper Trust No. 1 executed by Wes Kerper and Hazel B. Kerper was ineffective as an attempted modification of an irrevocable trust and void ab initio because no power to revoke, amend or modify the September 17, 1973 trust was reserved to the settlors.

(5) The Wyoming Principal and Income Act (W.S. 2–3–601 through 2–3–614) did not apply to the September 17, 1973 trust instrument or to the October 1, 1974 trust instrument because the trust granted to the trustee the power to determine the allocation of receipts and expenses between principal and income limited

only by the standard of "good faith" in exercising the trustee's duties.

(6) The royalties on the legal treatises were held under the terms of trust whereby the Wyoming Principal and Income Act did not apply to the distribution of the royalties and that all receipts or income from the royalties on these books were to be distributed to the income beneficiaries.

Based on the pretrial holdings, it appeared the court determined that instead of there being one trustee of one trust, as all the parties apparently assumed was the case before this lawsuit was filed, there were four separate trusts. Each of these trusts contained different assets and each was to be administered under different terms. (See footnote 1).

The trust assets included stock in Costa Rican companies. In 1985–1986 the trustee incurred substantial professional and consultant fees in attempting to conduct a liquidation of the Costa Rican assets. That transaction was finalized in late September 1986.

During the same time period the trustee signed a purchase offer on land in Hawaii and made a down payment on the deal. The trial court orally entered a restraining order effective October 6, 1986, restraining Loujen Kerper from expending, transferring or otherwise disposing of any trust money, property or assets until further order of the court. No bond was filed, no written motion was ever made requesting a restraining order and the parties were not given notice that a restraining order might be issued at that time. A written restraining order confirming all of this was entered on October 23, 1986. On October 21, 1986, the trustee filed a petition asking permission to transfer money out of trust assets to complete the land deal, but the court did not allow that and the down payment was forfeited.

The case went to trial and the district court entered an order removing Loujen Kerper as trustee, appointing First Wyoming Bank of Cody as the successor trustee, requiring Loujen Kerper to deliver all of the trust property to the successor trust-

ee, surcharging Loujen Kerper for $75,200 by reason of her expenditure of trust funds in connection with the contract for the purchase of Hawaii lands, surcharging Loujen Kerper for $86,300 for expenditures and property transferred to Russell Karaviotis in connection with his assistance in liquidating the Costa Rican assets and surcharging Loujen Kerper an additional $47,901 paid to other professionals in connection with the administration of the trust.

The district court's order also required the four Kerper daughters to transfer that portion of the estate of Wes Kerper transferred to them under the 1981 decree of distribution in the W.G. Kerper estate to the trust, and imposed liability on them for an amount equal to one-fourth of $326,-987.38 less the value of the property reconveyed by the Kerper daughters to the trustee.

I

The appellants complain that "[t]he District Court improperly surcharged the trustee without finding that the trustee had failed to act in good faith."

▇ Appellants contend that the settlor of the trusts limited the liability of the trustee and that the trial court did not use the proper standard in determining the trustee's liability. Generally the trustee of an express trust must act in a fiduciary capacity with respect to trust property. *Restatement (Second) of Trusts* § 2 at 6 (1959). The common law duty of loyalty is the fundamental duty from which each more specific trustee's duty is derived. *Restatement (Second) of Trusts* § 170 at 364 (1959). A trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property. *Restatement (Second) of Trusts* § 174 at 379 (1959). However, the settlor of an express trust has the right to modify the fiduciary duties that ordinarily govern the administration of a trust.

"By the terms of the trust the trustee may be permitted to do what in the ab-

sence of such a provision in the trust instrument would be a violation of his duty of loyalty." A. Scott, *The Law of Trusts*, § 170.9 at 1321 (1967).

Kerper Trust No. 1, dated October 1, 1974, grants Loujen, as trustee, certain powers. That trust reads in relevant part as follows:

"4. The trustee shall have the following powers to be exercised in a fiduciary capacity *and shall not be liable for loss if they are exercised in good faith.*" (Emphasis added.)

Paragraph 3 of Kerper Trust No. 1, dated September 17, 1973, makes a similar recitation as that in the 1974 trust.

In addition to the limitation on liability indicated above, appellants direct our attention to other provisions in the October 1, 1974 trust as follows:

(a) Has no obligation to increase the trust corpus;

(b) Has to distribute *both* ordinary income and capital gain income;

(c) Has the power to reinvest accumulated income of the trust;

(d) Has the express power to deal with herself;

(e) Has no duty for accounting, *except* upon a beneficiary's written request, and even then only upon an arrival basis.

Appellants assert that the release from liability contained in the October 1, 1974 trust and the September 17, 1973 trust together with the recitations in the October 1, 1974 trust set out above (a through e) expressly modified other fiduciary duties.

■ We hold that the provision in the two trusts "shall not be liable for loss if they are exercised in good faith" is a limitation on liability. The recitations in the October 1, 1974 trust set out above (a through e) are a delineation of some duties and powers of the trustee. The limitation on liability and the delineation of powers and duties in combination, however, do not modify ordinary fiduciary duties of the trustee except as specifically provided in the trust. The district court properly considered the Uniform Fiduciaries Act, W.S. 2-3-201 through 2-3-211, so far as that

Act sets out a standard of care and skill for the trustee.

■ Although the requirements of care and skill may be relaxed or modified, "[a] provision in the terms of the trust fixing a standard of care or skill lower than that which would otherwise be required of a trustee is strictly construed." *Restatement (Second) of Trusts* § 174, comment d at 380 (1959).

"It is unthinkable that a trustee not have the obligations of a fiduciary. See Uniform Fiduciary Act; § 4-1-101, *et seq.*, W.S. 1977 [now W.S. 2-3-201]. A trustee cannot by agreement escape the fiduciary obligations of a trustee under Wyoming statutory provisions." *Gaudina v. Haberman*, 644 P.2d 159, 167-168 (Wyo. 1982).

There are sound reasons for strictly construing provisions in a trust that may appear to lower and modify the standard of care and skill in administering a trust. Such modifications or lowering of the standard is a departure from common law. If the standard of care, skill and honesty is to be diminished—how much? Also, how much neglect can be tolerated?

■ We have carefully examined the trust instruments and, except for the provision allowing the trustee to deal with herself, cannot otherwise find a clear indication by the settlors directing that duties of the trustee be lowered and modified. It seems clear, however, that the settlors intended that the liability of the trustee be modified in the event of mismanagement.

Apparently the district court was of the opinion that the trustee should be liable for mismanagement of the trust whether or not she acted in good faith. In its conclusions, among other things, the court determined:

"29. *Even though the Trustee may have acted in good faith* or under a mistake as to the extent of her duties and powers, the violation or neglect of her duties as Trustee does constitute a breach of trust for which the Trustee may be removed.

"30. The use by the Trustee of $68,000.00 of trust funds, together with the expenditure of an additional $7,200.00, all in connection with a contract for the purchase of Hawaiian lands, did not show and was not in accordance with *the standard of judgment and care under the circumstances which men of prudence, discretion and intelligence exercise in the management of their own affairs*, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of their capital. *As a result*, Loujen Kerper, as Trustee, may be surcharged for such investment and expenditures.

"31. The Trustee had the burden to prove that her contract with Mr. Karaviotis was reasonable, was of benefit to the trust, was in good faith, *and was within the judgment and care under the circumstances then prevailing which men of prudence, discretion and intelligence exercise in the management of their own affairs.*

"32. Loujen Kerper, as Trustee, has not fulfilled her burden of proof with respect to the reasonableness, benefit to the trust, or prudence in executing the contract with Mr. Karaviotis or making payments to him or for him or in transferring stock to him." (Emphasis added.)

It is evident from the district court's conclusions stated in paragraphs 29 through 32 that it did not give effect to the settlors' intent to limit the trustee's liability for the administration of the trust. Instead it incorrectly used the reasonably prudent man standard to find the trustee liable to the trust because she did not establish that she met that standard. The court in effect ruled that the trustee's good faith was immaterial if she did not meet the reasonably prudent man standard and incorrectly imposed surcharges against the trustee and disallowed expenses of administration without first finding that the trustee did not act in good faith.

Although it is somewhat of a departure from our usual appellate review role, we are convinced that the record will sustain only one conclusion, i.e., that Loujen Kerper's administration of the trust was fully consistent with the good faith standard which must be used to test her management of the trust. Therefore, we reverse all provisions of the district court's order surcharging Loujen for mismanagement of the trust.

II

On May 25, 1974, Hazel Kerper executed a will containing the following pertinent language:

"2. I give, devise and bequeath to my husband W.G. Kerper if he survives me all right, title and interest I have at the time of my death in the residence real property located at 2018 Avenue S, Huntsville, Texas with improvements, water rights and appurtenances, subject to any existing mortgage obligation against said property.

"3. I give, devise and bequeath all of the rest, residue and remainder of my property and estate of whatever kind and wherever situate in trust to the trustee under Kerper Trust No. 1 dated September 17, 1973, to be added to and become a part of the corpus of said trust and to be held, managed, administered and distributed according to the terms and conditions thereof.

\* \* \* \* \* \*

"5. This is one of two reciprocal contract wills and is executed and attested by me in consideration of the agreement now made with my husband that he execute and attest a contract will reciprocal to this one, and that neither this will nor my husband's reciprocal will shall be changed, altered or modified during the lifetime of either of us except by mutual agreement."

All of the parties to these appeals agree that Wes Kerper executed a will containing similar provisions on the same day.

In its September 22, 1986 summary judgment order the district court found the 1974 wills to be *mutual* and *reciprocal* and found the language in paragraph 3 to be evidence of an express contract between

Wes and Hazel Kerper for the disposition of their estates. Appellant Loujen Kerper challenges these findings, urging that the 1974 wills are not reciprocal and that the findings were incomplete to establish a binding contract. Since the material facts involved in this issue are not in dispute we review this summary judgment order, as incorporated into the final judgment, in terms of alleged errors of law. *Fitch v. Buffalo Federal Savings and Loan Association*, 751 P.2d 1309, 1311 (Wyo.1988).

This court summarized the definitions of joint, *reciprocal* and *mutual* wills in *Shook v. Bell*, 599 P.2d 1320, 1321 (Wyo. 1979), when we said:

"Although the courts have not been uniform in their use and definitions of the terms, we define 'joint' wills, 'reciprocal' wills, and 'mutual' wills as follows: A 'joint' will is a single testamentary instrument constituting or containing the wills of two or more persons, and jointly executed by them. 'Reciprocal' wills are those in which each of two or more testators makes a testamentary disposition in favor of the other. 'Mutual' wills are two or more separate instruments, each executed by separate testators and manifesting a common intention to dispose of their property in a particular manner. We do not include as part of the definition of a mutual will, as some courts do, the elements of execution by each testator pursuant to an agreement, each in consideration of the other. 1 Bowe–Parker: Page On Wills, §§ 11.1 and 11.3; 97 C.J.S. Wills § 1364e(1); 79 Am.Jur.2d, Wills, § 754."

Also quoted in *Matter of Estate of Bell*, 726 P.2d 71, 74 (Wyo.1986). Based on these simple definitions we hold that the Kerper's 1974 wills were *reciprocal* in devising title to the Texas residence to one another, and *mutual* in establishing a common plan for disposition of the residue of their respective estates.

In *Shook v. Bell*, 599 P.2d at 1324, we intimated that mutual wills, which recited a contract to dispose of spousal estates, might be evidence of such a contract sufficient in itself to establish its existence.

For such a contract to be valid it must otherwise comply with the law of contracts in Wyoming. There must be an offer and acceptance along with bargained for and exchanged valuable consideration. See W. Jaeger, *Williston On Contracts* § 119B at 493–494 (3d ed. 1957). Valuable consideration in this context may consist of a spousal exchange of mutual promises, which promises impose a legal liability upon each promisor. *Williston On Contracts*, § 370 at 908–913; and *Schmidt v. Foster*, 380 P.2d 124, 126 (Wyo.1963).

*Shook* also quoted *Flohr v. Walker*, 520 P.2d 833, 837 (Wyo.1974), where we said:

"The general rule seems to be that a joint and mutual will executed pursuant to an agreement based on valuable consideration is contractual as well as testamentary and becomes an irrevocable obligation on the part of the surviving testator upon the death of the other party testate under a will which is in accord with the terms of the agreement. *In re Estate of Wade*, 202 Kan. 380, 449 P.2d 488, 493; *Godwin v. Wachovia Bank & Trust Company*, 259 N.C. 520, 131 S.E.2d 456, 462–463; *Alocco v. Fouche*, 190 Cal.App.2d 244, 11 Cal.Rptr. 818, 822; 57 *Am.Jur.* Wills, § 712; 97 *C.J.S.* Wills, § 1367e(2), p. 307."

This does not mean that a will containing such a contract is irrevocable in and of itself after it is executed. A will is ambulatory and may be revoked pursuant to statutory requirements at any time. See W.S. 2–6–117. It does mean, however, that where a surviving spouse revokes the mutual contract will and makes a new disposition of the property in his estate he has violated the contract with his deceased spouse. In this regard, this court long ago quoted with approval the rule set forth in *Brown v. Superior Court In and For Los Angeles County*, 34 Cal.2d 559, 564, 212 P.2d 878, 881 (1949):

"Where two parties agreed to make mutual wills, each promising to dispose of his property to the other or, if the other be dead, to certain third persons, and one of the parties performs by leaving his

property to the other, the intended devisees and legatees are entitled to enforce their rights as beneficiaries under the agreement. The contracting party who survives becomes estopped from making any other or different disposition of the property, and his obligations *under the agreement* become absolutely irrevocable and enforceable against him, *at least where he avails himself of the provisions of decedent's will in his favor and accepts substantial benefits thereunder.*" (Emphasis added.) (Adopted in *In re Stringer's Estate*, 80 Wyo. 389, 406, 343 P.2d 508, 514, rehearing denied and opinion modified, 80 Wyo. 389, 345 P.2d 786 (1959); also quoted in *Shook v. Bell*, 599 P.2d at 1323).

We went on to state:

"We said in *Stringer, supra,* adopting the holding in *Schomp v. Brown*, 215 Or. 714, 335 P.2d 847, that mutual or reciprocal wills, even though revoked, will stand as evidence of the contract. *The agreement which provides the underpinning for the contractual wills is irrevocable if the survivor takes advantage of the provisions of the will made by the other.* We noted in *In re Stringer's Estate*, quoting from *Canada v. Ihmsen*, 33 Wyo. 439, 456, 240 P. 927, 43 A.L.R. 1010, 1014 and authorities therein contained, that agreements to make mutual and reciprocal wills between husband and wife should be favored. 80 Wyo. at 407, 343 P.2d at 514." (Citations omitted and emphasis added.) *Shook v. Bell*, 599 P.2d at 1324.

The district court correctly found that Wes and Hazel Kerper could execute a valid contract to dispose of their estates in mutual wills and that one of those wills can stand as evidence of such a written contract. Paragraph 3 of Hazel Kerper's 1974 mutual will fits this description.

Before we can apply the language on *Shook v. Bell* to these cases, we must address appellants' challenges to the terms of the 1974 will contract. Appellants argue that the terms of the contract are ambiguous and should be reinterpreted by this court in conformance with extrinsic evidence, reversing the conclusions of the trial court. We disagree.

The contract consists of paragraph 3 of Hazel Kerpers' 1974 mutual will, set out above, and a document titled "Kerper Trust No. 1" executed September 17, 1973, incorporated by reference in the 1974 wills. The pertinent provisions in that trust document read as follows:

"KERPER TRUST NO. 1

"THIS KERPER TRUST NO. 1 executed September 17, 1973 by and between W.G. Kerper and Hazel B. Kerper as grantors and Loujen Kerper as trustee WITNESSETH

"1. Grantors from time to time will assign, convey and deliver to the trustee properties which may include cash, securities, real estate and other properties to be held in trust by the trustee for the purpose and upon the terms herein provided.

"2. The trustee shall hold, manage, invest and reinvest the trust properties and shall collect the income thereof and dispose of the net income and principal as follows:

"*The net income shall be paid not less often than semiannually in equal shares to grantors' daughters,* Minabelle [Meike] Kerper Milodragovich, Loujen Kerper, Janeen Kerper and Jill Kerper Lennon for their lifetimes respectively. Upon the death of any of them except the last to die the payment to which such decedent would have been entitled shall go in equal shares per stirpes to her children surviving until the death of the last daughter of grantors; and if any said daughter dies without children then the payment to which she would have been entitled shall go to the surviving daughters of grantors in equal shares. *Upon the death of the last of grantors' daughters to die all principal and accumulated income of this trust shall be distributed in equal shares to the grandchildren of grantors then surviving per capita and not per stirpes.* Net income herein means both ordinary income and capital gain income less usual necessary expense incurred in adminis-

tering the trust or producing such income. The trustee has no obligation to increase the trust corpus.

\* \* \* \* \* \*

"7. This Kerper Trust No. 1 supersedes and takes the place of the following documents all of which are modified and merged into this Kerper Trust No. 1:

"declaration of trust executed September 7, 1965 by Loujen Kerper Kuiva (now Loujen Kerper)

"trust agreement executed December 15, 1967 by and between W.G. Kerper and Hazel B. Kerper as grantors and Loujen Bereman (now Loujen Kerper) as trustee

"amended declaration of trust no. 1 executed May 30, 1972 by Loujen Bereman (now Loujen Kerper)

"and all properties held by the trustee under any *of the above documents* shall hereafter be held and administered by trustee hereunder.

"THIS KERPER TRUST NO. 1 binds the heirs, devisees and personal representatives of the parties.

"EXECUTED the date first written above."

This use of a trust in a will is expressly authorized by statute. See W.S. 2–6–103.

Established contract law of Wyoming governs our review of this agreement. When an agreement is put into writing, it may consist of more than one document; if an extraneous document is specifically referenced in a contract, that reference renders the document part of the written agreement. *Hensley v. Williams*, 726 P.2d 90, 94 (Wyo.1986); *Busch Development, Inc. v. City of Cheyenne*, 645 P.2d 65, 68 (Wyo.1982). The intent of the parties to a clear and unambiguous written agreement will be derived from the entire writing and determined as a matter of law. *State Farm and Casualty Company v. Paulson*, 756 P.2d 764, 766 (Wyo.1988); *Wangler v. Federer*, 714 P.2d 1209, 1217 (Wyo.1986). Extrinsic evidence will not be used to contradict the plain meaning of a clear and unambiguous written agreement. *Nelson v. Nelson*, 740 P.2d 939, 940 (Wyo. 1987); *Rouse v. Munroe*, 658 P.2d 74, 78 (Wyo.1983).

We hold that the contract established by Wes and Hazel Kerpers' 1974 mutual wills, and the document titled "Kerper Trust No. 1" executed September 17, 1973, evidence a valid and binding written contract between Wes and Hazel Kerper that the survivor would not change his will, and that he would dispose of his estates according to the terms of the 1974 wills. That contract is clear and unambiguous as written.

In making this holding we reject the argument of some of the appellants that the existence of an extrinsic document titled "Supplement To Kerper Trust No. 1," executed at the same time as the 1974 mutual wills, creates an ambiguity in the terms of the contract. The alleged ambiguity stems from the fact that the supplement *identifies* previous trust agreements executed by Wes, Hazel and/or Loujen Kerper, which contain terms of distribution for assets of the Kerper estates that are inconsistent with those expressed in "Kerper Trust No. 1" executed September 17, 1973. We cannot accept this argument because it is premised on information contained in an extrinsic document being used by appellants to contradict the terms of a clear and unambiguous written agreement. The contract in question must be ambiguous before we resort to such evidence. See *Wangler v. Federer*, 714 P.2d at 1212. Whether a contract is ambiguous is a question of law. *Farr v. Link*, 746 P.2d 431, 433 (Wyo.1987). This court will not rewrite a clear and unambiguous written contract under the guise of interpretation. *Arnold v. Mountain West Farm Bureau Mutual Insurance Company, Inc.*, 707 P.2d 161, 166 (Wyo.1985). Similarly, our holding on the plain meaning of the Kerper's 1974 will contract preempts other appellants' arguments that it is in some way ambiguous.

With this in mind we apply the language in *Shook v. Bell*, 599 P.2d 1320 to the contract established in the 1974 mutual wills. To be bound by the contract, Wes Kerper must have "taken advantage of the provisions of the will," *Shook v. Bell* at 1324, thereby receiving consideration for

his part of the contract. Appellants argue that this phrase means Wes Kerper must have received and accepted direct material benefit under the provisions of Hazel Kerper's 1974 mutual will upon her death. They assert that Wes Kerper did not accept this kind of benefit upon probate of his wife's estate in 1975 and therefore was not bound under *Shook.* Appellants are construing the word benefit too narrowly.

■■■ Determining whether one of two testator/spouses to mutual contract wills takes advantage of such a will after the other spouse dies depends upon the nature of the provisions in the deceased spouse's will. If that will directs that the surviving spouse is to receive a direct material benefit under the will, the surviving spouse takes advantage of it when he accepts that benefit. Receipt of the benefit provides the consideration necessary to make the concurrent will contract binding under *Shook v. Bell,* 599 P.2d 1320. Likewise, when spouses execute mutual contract wills, which direct that a deceased spouse's estate is to be transferred to a trust that they both execute for the benefit of their children and grandchildren, the surviving spouse benefits when the transfer of the deceased spouse's assets to the trust is accomplished. In the latter situation, the surviving spouse is having his wishes regarding the disposition of the deceased spouse's estate fulfilled, and therefore, receives a benefit.

A benefit is not always material, and appellants have not cited any authority to this court that even impliedly refutes this application of the "takes advantage" language in *Shook v. Bell.* We have found authority, however, applying the above interpretation of the word "benefit" in this context. See, e.g., *Citizens and Southern National Bank v. Leaptrot,* 225 Ga. 783, 171 S.E.2d 555, 558 (1969); *Schomp v. Brown,* 215 Or. 714, 335 P.2d 847, 850, reh. denied and opinion clarified 215 Or. 714, 337 P.2d 358 (1959); *Ankeny v. Lieuallen,* 169 Or. 206, 113 P.2d 1113, 1118 (1941), dismissed on rehearing 169 Or. 206, 127 P.2d 735 (1942).

In these cases, Wes Kerper wanted the assets in Hazel Kerper's estate to become part of Kerper Trust No. 1, executed September 17, 1973, upon her death. He realized that desire upon probate of her estate under her 1974 mutual will. As a result, he took advantage of the provisions of her 1974 mutual contract will and is bound by the contract he made with her. *Shook v. Bell, supra.*

Having affirmed the existence of a valid, binding, clear and unambiguous written contract between Wes and Hazel Kerper, we next review the trial court's findings that Wes Kerper breached that contract. On July 15, 1980, after remarrying to Mildred I. Franks, Wes Kerper executed a new will revoking the 1974 mutual contract will and directing that his estate be dispersed upon his death as follows:

"I, Wesley G. Kerper also known as W.G. Kerper a resident of Cody, Park County, Wyoming hereby make, publish and declare this my last will and testament.

\* \* \* \* \* \*

"2. I give, devise and bequeath to my wife Mildred I. Kerper all properties and investments in joint ownership with her either as joint tenants, tenants by the entireties or tenants in common if she survives me, and if not in equal shares to my children surviving. By this bequest it is my intention to bequeath to Mildred I. Kerper those assets acquired with the income from my separate estate received subsequent to the death of my wife, Hazel B. Kerper.

"3. *I give, devise and bequeath all the rest, residue and remainder of my property and estate of whatever kind and wherever situate in equal shares to my daughters, Minabelle [Meike] Kerper, Loujen Kerper, Janeen Kerper and Jill Kerper Lennon, an undivided one fourth thereof to each; and if any predeceases me the share she would have taken shall go in equal shares to her children surviving and if none in equal shares to my other daughters surviving.*

\* \* \* \* \* \*

"5. This will is made with reference to and to carry out more specifically in accordance with the original agreement and contract the provisions of the reciprocal contract will executed by me on May 25, 1974.

\* \* \* \* \* \*

"7. I revoke all former will and testamentary papers made by me.

"I, Wesley G. Kerper also known as W.G. Kerper, testator, being first duly sworn sign my name to this instrument this day and hereby declare to the undersigned authority that I sign and execute this instrument as my last will; that I sign it willingly and execute it as my free and voluntary act for the purposes therein expressed; and that I am an adult person of sound mind and under no constraint or undue influence.

"DATED July 15, 1980."

Contemporaneous with this 1980 will, Wes Kerper and his four daughters entered into a written agreement which read:

"THIS AGREEMENT executed July 15, 1980 by and between Wesley· G. Kerper also known as W.G. Kerper herein called W.G. and Minabelle [Meike] Kerper, Loujen Kerper, Janeen Kerper and Jill Kerper Lennon herein called Kerper children WITNESSETH

"WHEREAS on May 25, 1974 W.G. and Hazel B. Kerper then husband and wife executed reciprocal contract wills leaving substantially all property owned by them to Kerper Trust No. 1 dated October 1, 1974; and

"WHEREAS in accordance with the original understanding between W.G. and Hazel B. Kerper a later will dated July 15, 1980 has been executed and attested by W.G.

"NOW THEREFORE in consideration of love and affection and other valuable consideration it is hereby agreed as follows:

"1. The later will executed by W.G. on July 15, 1980 shall control in the disposition of his properties and estate and any provisions of his reciprocal contract will dated May 25, 1974 that may be contrary or inconsistent with the last will executed July 15, 1980 shall be modified to carry out the provisions of his last will, copy of which is annexed as Exhibit A.

"2. In accordance with the original understanding between W.G. Kerper and Hazel B. Kerper and in further accordance with the antenuptial agreement dated September 16, 1975 between Mildred I. Franks and W.G. Kerper, W.G. agrees that assets owned by W.G. prior to his marriage to Mildred I. Franks are his separate property and that none of these assets shall be converted into any form of joint ownership with Mildred I. Kerper, nor to her individually.

"3. Kerper children and each of them hereby waive and relinquish all provisions in said contract will of May 25, 1974 executed by W.G. that may be contrary or inconsistent with the last will executed by him on July 15, 1980 and agree specifically to be bound by the terms of said last will.

"This agreement binds and inures to the benefit of the parties, their heirs, devises and personal representatives.

"EXECUTED the date first written above."

Wes Kerper did acknowledge the existence of his contract will with Hazel in these documents. The 1980 will revokes all prior wills, and along with the agreement with the four daughters, requires that the portion of Wes Kerper's estate in existence when he entered the 1974 contract was to be distributed in equal shares to the four daughters outright upon his death and the grandchildren would take only if their mother was deceased.

We have held that the 1974 wills constituted a contract. The final issue we must now address is whether Wes Kerper's 1980 will constituted a breach of that contract. We hold that it did not. The remedy employed by the district court, i.e., imposition of a constructive trust and requiring reimbursement to the trust of the assets distributed to the four Kerper daughters under the 1980 will, does vindicate the literal language of the 1974 contract will but it does so at the price of imposing a burden on the daughters that is

the antithesis of the spirit, as well as the letter, of the elder Kerpers' efforts to provide for their daughters. Although we declined to consider the extrinsic documents and evidence in construing the unambiguous language of the 1974 wills, we are constrained to consider it in determining whether Wes Kerper's 1980 will was a breach of that contract. To do otherwise would result in our condoning a remedy which ravages the lives of the daughters who were the primary, if not the only real, focus of Wes and Hazel Kerper's estate plan. We hold that Wes Kerper's 1980 will substantially complied with the contract he entered into with Hazel Kerper. See Corbin, *Contracts*, Chapter 36 (1963). To the extent the grandchildren had an expectancy under the contract, that expectancy was realized in the form of benefits flowing directly to their mothers and indirectly to them as dependents of their mothers and as the natural heirs of their mothers' estates. A conclusion that the grandchildren would be better off had Wes Kerper performed his contract more literally is speculative, counterproductive, produces an absurd result and cannot be sustained under the unique circumstances of this case.

Many dissenting opinions recently issuing from this court are disturbing because of their sarcastic nature, ridicule of the majority and silly references to nursery rhymes. The dissents in this case continue the pattern. There is a total refusal to even acknowledge that a doctrine of substantial performance exists, though it is found in 17 *Am.Jur.2d* Contracts, § 375, commencing at page 818; in *Corpus Juris Secundum;* and in thousands of cited cases. The dissents portray the majority opinion as having sold out the law to produce a result. We do not understand the use of such intemperate language amongst the brethren of this court. It is the sort of small-mindedness that says to us, "if you don't agree with me, you are not only wrong but stupid as well." Why is it that the disagreement must be so acerbic? It would be enough to disagree and state plainly the reasons why. I suspect that the need to employ such unfair and intemperate criticism arises mainly from lack of any

substantive defense for the arguments presented. It seems that dissents have become an excuse to be cute? witty? sarcastic? appeal to base instincts? a forum for views that merely pollute the reporter system rather than the statement of disagreement, hopefully based on law, that they are intended to be.

The syllogism employed by the dissent, if indeed it is a syllogism, mistakes the holding of the opinion. The tirade of the companion dissent is patently wrong. The holding of the court is that:

1. Wes Kerper made a contract with his wife.

2. He substantially performed the contract.

3. He acted in good faith, received no benefit, and took none of the property for himself that he and Hazel agreed should go to their children.

4. He did not, therefore, breach the contract.

Justices Brown and Thomas would apply the law mechanically and without regard to any accommodation for practicality. A principle of justice and, perhaps of the "law" as well, is that where the reason for the law ends so should the law (*cessante ratione legis, cessat et ipsa lex*). The assertion that this decision is not supported by logic is at best absurd. How can it be illogical to conclude that Wes Kerper's actions, which do no violence to his children's lives and which satisfy the primary intent of Wes and Hazel to provide for the future security and well-being of their own children, are illogical? It may be argued that what Wes did was not substantial performance, but it can never be argued that such a principle does not exist or that it is inapplicable in this case, however one might come out after analyzing the case in the light of that principle.

This court will better serve the public, the law, and its own credibility if an effort is made to return the dissenting opinions to their proper role. Until that occurs, we are compelled to observe that the dissents are like Mother Hubbard who went to the cupboard and found it bare. They likewise are

bare of logic or law to support their position; thus, the necessity for ridicule, sarcasm and supposedly clever witticisms.

We hold, therefore, that the provisions of the district court's order directing reimbursement to the trust of the assets, or the value thereof, received by the Kerper daughters under the 1980 will is reversed.

### III

In its September 8, 1987 findings and conclusions the district court determined that

"[t]he hostility and animosity between Loujen Kerper as Trustee and Meike Kerper, a beneficiary of the trust, is such that it does interfere with proper administration of the trust and does constitute a ground for removal of Loujen Kerper as Trustee.

"18. The animosity and hostility between Loujen Kerper, Janeen Kerper and Jill Kerper, on one hand, and Meike Kerper on the other hand, has reached a level that future cooperation and proper administration of the trust is improbable unless Loujen Kerper is removed as Trustee and an independent Trustee is appointed as successor Trustee.

&ast; &ast; &ast; &ast; &ast; &ast;

"54. The removal or retention of a Trustee should be decided on what is in the best interest of the beneficiaries."

The trial court went on to order Loujen to turn over all trust property and records to the First Wyoming Bank of Cody as successor trustee.

Appellants Janeen and Jill Kerper argue that the trial court should not have removed Loujen as trustee because of alleged familial hostility. Loujen also joins her sisters in arguing that the trial court did not have a sufficient factual basis to conclude that there was enough animosity between the four Kerper daughters to justify removing Loujen as trustee.

◼ Generally, social or familial hostility between the trustee and one or more beneficiaries of a trust is insufficient in and of itself to warrant removal of a trustee. The real question in these situations is whether or not the hostility, in combination with existing circumstances, materially interferes with the administration of the trust or is likely to cause that result. See cases cited in Annotation, *Hostility Between Trustee and Beneficiary as Ground for Removal*, 63 A.L.R.2d 523, 525–526 (1959) and 62–66 A.L.R.2d *Later Case Service* at 270–271; G. Bogert, *The Law of Trusts and Trustees* § 527 at 86–94 (Rev.2d ed. 1978). The power of a district court to remove a trustee for these or other reasons is rooted in equity, and the court has sound discretion to make a determination as to removal. W.S. 2-3-210; 63 A.L.R.2d *supra* at 531 and 62–66 A.L.R.2d *Later Case Service* at 271–272. We will not disturb an exercise of district court discretion unless its actions are shown to have been made arbitrarily and capriciously and in disregard of the use of sound judgment regarding what is right under the circumstances. *Martin v. State*, 720 P.2d 894, 897 (Wyo.1986).

◼ In these cases the district court determined that sufficient hostility existed between Meike Kerper and the trustee to warrant removal of Loujen as trustee. We disagree with the appellants who claim that Meike's testimony was the only evidence in the record supporting that decision. Several of the district court's findings of fact also figure into the hostility equation. The court specifically found as facts that the trustee's activities concerning: her sister Meike's use and upkeep of the family cabin, the contents of letters between the trustee and the beneficiaries, the trustee's noncompliance with discovery orders and the trustee's removal of the Husky oil royalty from the jurisdiction of the court while these cases were pending, all evidenced animosity between Meike Kerper and the trustee. Cf. *Dennis v. Rhode Island Hospital Trust National Bank*, 744 F.2d 893, 901 (1st Cir.1984) (holding that the course of litigation itself can demonstrate hostility sufficient to warrant removal of a trustee). These facts, as found by the district court, clearly support a legal conclusion that the hostility between Meike and Loujen had the potential to adversely affect the proper ad-

ministration of the trust and therefore supports the court's order removing Loujen as trustee on that basis. We do not, however, see sufficient findings of fact in this record to support the conclusion that any hostility and animosity that exists between Meike and her sisters Jill and Janeen warrants appointment of an independent trustee at this time.

With that holding in mind, we briefly address appellants' argument that the express language of the October 1, 1974 trust gave the four Kerper daughters the exclusive right to determine among themselves which person or entity would replace Loujen as trustee if that situation ever occurred. This argument is based on the following language from the trust document executed on October 1, 1974:

"8. If the trustee or any successor trustee *dies, resigns or fails to serve as trustee a successor trustee shall be appointed by the daughter or daughters of grantors then surviving.* If a vacancy occurs in the position of trustee *by reason of the death of the last of grantors' daughters to die or for other reasons,* then First State Bank, Cody, Wyoming [now First Wyoming Bank of Cody] shall be the successor trustee to carry out the provisions of the trust." (Emphasis added.)

Appellants contend that the district court's reason for removing Loujen as trustee, animosity between the trustee and one of the beneficiaries, falls under the "dies, resigns or fails to serve as trustee" language quoted above. Appellees say that the court's reason for removing Loujen as trustee falls within the "for other reasons" language of the same paragraph.

 This disagreement over the meaning of the words in paragraph 8 of the 1974 trust must be resolved with the goal effectuating the intention of the settlors. When possible that intent is to be ascertained from the words in the trust instrument if they can be given meaning that will not defeat the general purpose for establishing the trust. *First National Bank & Trust Company of Wyoming v. Brimmer,* 504 P.2d 1367, 1369 (Wyo.1973). Also relevant to this discussion is *Restatement (Second) of Trusts* § 108 at 238 (1959), which states:

"If a trust is created and there is no trustee or if the trustee, or one of several trustees, ceases for any reason to be trustee, a new trustee can be appointed

"(a) by a proper court; *or*

"(b) *by the person, if any, who by the terms of the trust is authorized to appoint a trustee."* (Emphasis added.)

 Giving the words quoted in paragraph 8 plain meaning, we hold that the district court's removal of Loujen as trustee falls within the "or fails to serve" language, thereby requiring that a replacement trustee be chosen by the Kerper daughters. We hold that the "for other reasons" language is too vague to apply in this situation when the "fails to serve" language can be applied through normal usage. That portion of the district court's order appointing the First Wyoming Bank of Cody successor trustee is reversed.

THOMAS, J., filed a dissenting opinion.

BROWN, J., Ret., filed an opinion concurring in part and dissenting in part in which THOMAS, J., joined.

THOMAS, Justice, dissenting.

I, too, must dissent from the resolution of the issues according to part II of the majority opinion. Expressed as a syllogism, that aspect of the majority opinion must be stated as:

· Wes Kerper made a contract with his wife, Hazel, to dispose of his property in a particular way in his will.

· Wes Kerper disposed of his property in a different way in his will.

· Therefore, Wes Kerper performed his contract with his wife.

Justice Brown has succinctly noted that this resolution is not supported by the law. It is not supported by logic either. Therefore, without justification in either law or logic, it is not supported. That's logic.

I know that the statue of Justice normally is depicted with a blindfold on the figure. The blindfold is symbolic of the absence of bias. It does not justify overlooking the law or the facts, nor does it serve to permit

Justice to ignore the scale and conclude that the lighter weights are heavier or vice versa.

I have heard judicial figures complain of result-oriented decisions. Now, I more fully appreciate those complaints. Perhaps I was hasty in saying that the majority decision is not supported; it finds its support in the result that the majority chose.

At one juncture, it occurred to me that perhaps the result could be supported because of the failure to present the claim of the disenfranchised trust beneficiaries in the probate proceeding for Wes Kerper's estate. *Hawkey v. Williams*, 72 Wyo. 20, 261 P.2d 48 (1953), dispels that notion. The only conclusion I can reach is that the trial court appropriately and dispassionately invoked and applied the remedies for breach of contract to make a will. While the result may appear to be harsh, I see no way to avoid the dictates of precedent.

I would affirm the trial court with respect to its order directing reimbursement to the trust of the assets or the value thereof distributed to the Kerper daughters in the probate proceedings.

I regret the fact that my efforts to articulate my position in this case have provoked such an impassioned response, but I see no need to recede from my position.

BROWN, Justice, Retired, concurring in part and dissenting in part, with whom THOMAS, Justice, joins.

The majority cast itself into the role of an omnipresent big brother. In this not unfamiliar personification, the majority arrogates to itself the mission of correcting all Kerper derelictions and profligacy. In order to accomplish its predetermined mission, the majority: (1) determined that the agreement between Wes and Hazel Kerper should be rendered of no effect and that it should be rewritten to reflect the wisdom of the majority; and (2) the majority further granted absolution to the Kerper sisters and saved them from themselves.

It apparently is of no consequence to the majority that while accomplishing this remarkable feat they did violence to the law of contracts, trusts and future interests.

In its opinion, the majority carefully delineates the adjudicative facts of this case and applicable law, then in the last paragraph of page 19 of the opinion, the majority surprises the reader by ignoring what it has previously said about the law.

The magic paragraph on page 936 of the majority opinion states:

*We have held that the 1974 wills constituted a contract. The final issue we must now address is whether Wes Kerper's 1980 will constituted a breach of that contract. We hold that it did not.* The remedy employed by the district court, i.e., imposition of a constructive trust and requiring reimbursement to the trust of the assets distributed to the four Kerper daughters under the 1980 will, does vindicate the literal language of the 1974 contract will but it does so at the price of imposing a burden on the daughters that is the antithesis of the spirit, as well as the letter, of the elder Kerpers' efforts to provide for their daughters. Although we decline to consider the extrinsic documents and evidence in construing the unambiguous language of the 1974 wills, we are constrained to consider it in determining whether Wes Kerper's 1980 will was a breach of that contract. To do otherwise would result in our condoning a remedy which ravages the lives of the daughters who were the primary, if not the only real, focus of Wes and Hazel Kerper's estate plan. *We hold that Wes Kerper's 1980 will substantially complied with the contract he entered into with Hazel Kerper. See Corbin, Contracts, Chapter 36 (1960). To the extent the grandchildren had an expectancy under the contract, that expectancy was realized in the form of benefits flowing directly to their mothers and indirectly to them as dependents of their mothers and as the natural heirs of their mothers' estates.* A conclusion that the grandchildren would be better off had Wes Kerper performed his contract more literally is speculative, counterproductive, produces an absurd result and cannot be sustained under *the*

*unique circumstances of this case.* (Emphasis added.)

This incredible holding reminds me of the legend of Adami and Heva. According to this ancient epic, a raging river separated Adami and Heva. The river was not only deep, swift and wide, but was inhabited by piranha-like creatures that would consume an intruder in a single gulp. When confronted with the impregnable river barrier, Adami simply declared that the river was not there and then walked on dry land to Land Bountiful and the waiting arms of Heva.

So it is in this case. The majority avoided an insoluble problem by simply declaring that there was no breach of contract. They made this strange ruling without the support of credible authority or rational analysis.

I suspect that Wesley G. Kerper would be surprised to learn that the Wyoming Supreme Court said that he did not breach his 1974 contract. He thought he did. Jerry W. Housel, longtime friend and attorney of Wes Kerper, testified at trial with respect to the breach of contract:

Q. Did Mr. Kerper, who was an attorney, ever mention any problem with breaching his agreement with his first wife, Hazel Kerper, by entering into this new agreement?

A. [Mr. Housel] Well, I mentioned that to Wes when we first talked about it and *he said, well, he recognized it was inconsistent with an earlier will and the reciprocal provisions, but he was just confident no one would ever question it, and that's why he wanted to go ahead with it.*

\* \* \* \* \* \*

Q. Did you ever hear Wes Kerper or anyone tell Loujen that by entering into Plaintiffs exhibit 77 and by Mr. Kerper making a new will that he would be breaching a contract to make reciprocal wills with Hazel Kerper?

A. I don't recall that Loujen or Jill were present when I talked to him about that. I did discuss that with him, not in terms of necessarily breach. *I told him it was inconsistent* and he was not sure

that if push came to shove whether it might be followed, but he was so confident that no one would question it and they would accept it, he wanted to go ahead with it anyway, which he did, but I don't believe Loujen was in on that discussion. (Emphasis added.)

By making the express terms of the 1973 trust a part of the express and unambiguous 1974 will contract, Wes and Hazel Kerper gave grandchildren in being when Wes Kerper died the status of intended third-party beneficiaries under the contract. *Flohr v. Walker*, 520 P.2d 833, 838 (Wyo.1974). See also *Lane Company v. Busch Development, Inc.*, 662 P.2d 419, 423 (Wyo.1983). Their enforceable contract right was the right to see Wes Kerper's estate pour into the 1973 trust corpus creating vested remainders in them. See G. Bogert, *The Law of Trust and Trustees* § 182 at 346–52 (1979). Contrary to the majority's unsupported conclusion in the suspect paragraph, the grandchildren's interest in Wes and Hazel's contract was not some "speculation" that they might receive scraps cast off from their mothers' life estates in trust income; rather, it was an enforceable contract *right* to an outright share of the trust corpus if they survived the Kerper daughters.

Wes Kerper owed a clear contractual duty to the grandchildren in being at his death to pour the remainder of his estate into the trust and, of course, he knew that. In spite of that legal obligation, the will he drew in 1980 revoked his 1974 contract will with Hazel. The 1980 will provided in pertinent part:

3. I give, devise and bequeath *all* the rest, residue and remainder of my property and estate of whatever kind and wherever situate *in equal shares to my daughters, Minabelle [Meike] Kerper, Loujen Kerper [Trustee of the 1973 Trust], Janeen Kerper and Jill Kerper Lennon, an undivided one fourth thereof to each;* and if any predeceases me the share she would have taken shall go in equal shares to her children surviving and if none in equal shares to my other daughters surviving. (Emphasis added.)

On its face, the 1980 will disposed of assets that were supposed to become the corpus of the trust. It also purports to change the legal character of the living grandchildren's interests established in the will contract from vested to contingent remainders. By *executing this new will, revoking his 1974 contract will, and dispersing his estate contrary to the 1974 will and the unambiguous terms of the trust, Wes Kerper plainly breached his 1974 will contract with his wife to devise and bequeath the bulk of his estate to the trust as corpus,* thereby creating vested remainders in the grandchildren. The grandchildren had a solid contract right to equitable ownership of vested remainders in a trust corpus funded by Wes Kerper's estate and Wes Kerper frustrated the funding of the trust. That is the only conclusion one should be able to draw from the plain language of the controlling documents in this case.

What is perhaps most disturbing about the majority's holding is the total lack of authority to support their desired result. The only citation given as support for reversing the judgments against the Kerper daughters is a vague reference to the entire Chapter 36 of 3A A. Corbin, *Corbin on Contracts,* § 700 at 308–09 (1960), which discusses the contract doctrine of substantial performance. This citation is misleading. When I read that chapter, I find that it presents the doctrine of substantial performance with the following text:

> When one party *has failed to render a part of the performance as and when promised him,* the following questions may arise:
> 1. Is the other party privileged to refuse to render reciprocally promised performance?
> 2. Is the other party wholly discharged from his contractual duty?
> 3. Can the other party maintain suit for damages, regarding the breach as "total"?

Id. (emphasis added). *There is no way this doctrine can be applied to the facts of this case.* To rely on it the majority has to take the position that Hazel Kerper did not perform at least a part of the obligation that she promised in the 1974 will contract, thereby allowing Wes Kerper to only partially perform his part in a similar, equitable fashion. The majority's own recitation of the facts states that Hazel Kerper performed her part of the contract *in full* and that Wes Kerper accepted the benefits of that complete performance. Wes Kerper had no legal justification to invoke the theory of substantial performance, but this court fashioned one for him with a little creative legal writing.

The suspect paragraph in the majority opinion finally refers to the "unique circumstances of this case." I submit that the most unique thing about this case is the way the majority has danced around a clear breach of contract.

The trial court's determination that Wes Kerper breached his 1974 contract is supported by both the law and the facts as recited in the majority opinion. The fact that the consequences that flow from such breach are harsh should be a neutral factor with an appellate court. It should not be necessary for me to remind the majority what it is not. The Supreme Court is not a court of equity. It is not a tribunal designed to substitute its wisdom for the foolishness of others; and it was not designed to save people from their own greed and folly.

It seems that the majority has adopted a new rule in this case which is: "We are the Supreme Court. Therefore, we can do anything we want to do."

The majority should heed the words of the late United States Supreme Court Justice Cardozo:

> The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to "the primordial necessity of

order in the social life." Wide enough in ·all conscience is the field of discretion that remains.

Benjamin N. Cardozo, *The Nature of the Judicial Process* 141 (1921).

I agree with the majority in its resolution of the issues in Parts I and III, but dissent with respect to Part II and would affirm the trial court on that issue.