2006 WY 128

**WELLS FARGO BANK WYOMING, N.A., Appellant (Defendant),**

v.

**Edwin C. HODDER; Katherine E. Puls; Cecily A. Ellis; Mark Owen Krueger; David Earl Krueger; William Kent Krueger; and Margaret McKinney, Beneficiaries of the Lierd–Miracle Trust, Appellees (Plaintiffs).**

Nos. 05–256, 05–257.

Supreme Court of Wyoming.

Oct. 13, 2006.

Representing Appellant: Gary R. Scott of Hirst & Applegate, P.C., Cheyenne, Wyoming.

Representing Appellees: Frank R. Chapman of Chapman Valdez, Casper, Wyoming.

Before VOIGT, C.J., and HILL *, KITE, BURKE, JJ., and DONNELL, D.J.

KITE, Justice.

[¶ 1]  The beneficiaries of a trust filed a complaint against their trustee, Wells Fargo Bank Wyoming, N.A. (Wells Fargo), claiming

* Chief Justice at time of oral argument.

it breached its fiduciary duties.  After a bench trial, the district court held generally for the beneficiaries.  Wells Fargo appealed, asserting several points of error in the trial court's findings.  The beneficiaries filed a cross-appeal claiming error in the trial court's failure to award attorney fees and prejudgment interest.  We generally affirm, although we arrive at that result by applying a different standard than the trial court used.  Addressing specifically the trial court's holding that Wells Fargo improperly withheld $120,000 of trust funds, however, we reverse to the extent the holding did not allow the bank to retain trust funds to cover expenses associated with correcting a fuel spill and drainage problem on trust property.

## ISSUES

[¶ 2]  In its appeal, Wells Fargo presents the following issues:

*Case No. 05–256*

1.  Did the trial court err in failing to enforce the good faith provision of the original trust agreement?

2.  Did the trial court err in its finding that the sale of the five lots to Quality Stores by Wells Fargo was not a market value sale?

3.  Did the trial court err when it failed to find that Wells Fargo was [an] "innocent owner" and when it made Wells Fargo the guarantor for remediation of the Mini–Mart real property, and did the trial court have subject matter jurisdiction over that contamination issue?

4.  Did the trial court err in its finding that Wells Fargo improperly paid $10,000 to beneficiary Tim Miracle for his participation in Wells Fargo's sale of trust real estate[?]

5.  Did the trial court err in its finding that Wells Fargo Bank improperly withheld $120,000 from its final distribution, to cover closing expenses and contingent liabilities of the trust?

6. Did the trial court err in ordering Wells Fargo to mitigate the drainage problem at its expense?

*Case No. 05–257*

1. Did the trial court err by not awarding attorney's fees to the plaintiffs?

2. Did the trial court err by not awarding prejudgment interest to the plaintiffs?

In their cross-appeal, the beneficiaries present these issues:

1. Did the district court err by not awarding attorneys' fees to the beneficiaries after they prevailed on claims for multiple breaches of fiduciary duties by the trustee?

2. Did the district court err by not granting an award of prejudgment interest on the amount which the court found trust property had been undersold by the trustee?

### FACTS

[¶ 3] Floyd E. Miracle and Clifton L. Lierd owned real estate in east Casper. In 1968, they deeded their holdings into a revocable trust naming Wyoming National Bank as trustee. Norwest Bank Wyoming, N.A., subsequently purchased Wyoming National Bank and assumed the duties as trustee. Norwest Bank then sold its assets and liabilities to Wells Fargo which has since acted as trustee.

[¶ 4] The original trust authorized the trustee to exercise its powers during the grantors' lifetimes only in accordance with their written directions. Upon the death of one grantor, the agreement authorized the surviving grantor and trustee to dispose of the property "at any time and from time to time." Upon the death of the second grantor, the trust directed the trustee to distribute any remaining trust property in kind to the beneficiaries or, in its sole discretion, sell the property and distribute the proceeds. It also authorized the trustee:

To use its best judgment in exercising the powers, discretions and rights conferred by this agreement or in performing the duties imposed upon the Trustee by law, and, in order to feel free in doing so, to be exempt from liability for any action taken or omitted in good faith.

[¶ 5] The original trust inadvertently neglected to name any beneficiaries and so, in 1974, the grantors amended the trust to identify the beneficiaries. The amendment referenced the original trust and stated it "is amended and superseded by this amendatory contract." The amendment further stated the grantors "agree with one another and request said trustee to accept this agreement as an amendment to said trust agreement as follows and to the following extent." Substantively, in addition to identifying the beneficiaries, the amendment clarified and changed what was to occur upon the grantors' deaths. Upon the death of one grantor, the trustee and surviving grantor were to distribute by the end of each year any income received by the trust. Upon the death of the surviving grantor, the trustee was to distribute the property or sell the property and distribute the proceeds. The latter provision reiterated that the decision whether to sell or distribute the property was left to the trustee's discretion depending upon which alternative was in the beneficiaries' best interests. The final paragraph of the amendment stated: ". . . it is agreed that the original [of this amendment] shall be attached to the original trust agreement so as to become part thereof."

[¶ 6] Two years later, the trust was amended a second time. This amendment referenced the original trust, as amended, and stated:

"The parties to said Trust Agreement, being desirous of further amending the same, do hereby amend, supplement and modify said original revocable trust, as amended, to the extent specified and provided herein . . . ."

The 1976 amendment changed the trust to an irrevocable trust and gave the trustee the authority to act on behalf of and make decisions for the trust on a variety of matters without direction from the grantors or beneficiaries. The second amendment also named two of the beneficiaries as special trustees to assist the trustee with income distribution and real estate management decisions. The second amendment provided

the trustee would take over full administration of the trust upon resignation of the special trustees and also provided for termination of the trust. Neither the 1974 amendment nor the 1976 amendment specifically referenced the original trust provision exempting the trustee from liability for actions taken or omitted in good faith.

[¶ 7] In 2002, the beneficiaries filed a complaint against Wells Fargo. The complaint was followed a year later with an amended complaint and in 2004 with a second amended complaint. The complaints alleged Wells Fargo breached its fiduciary duties in numerous ways[1] and sought compensatory and punitive damages.

[¶ 8] Five of the allegations are relevant to this appeal. First, the beneficiaries claimed Wells Fargo sold five parcels of trust real estate to Quality Stores for less than market value without their unanimous consent and without obtaining an appraisal, attempting to market the property or consulting experienced real estate professionals to assist with the sale. The beneficiaries also claimed Wells Fargo failed to properly address a drainage problem that Quality Stores created on the five lots, which caused runoff on property purchased from the trust by another buyer and 6.7 acres of undeveloped property still owned by the trust. Also at issue on appeal are the beneficiaries' claims that Wells Fargo failed to adequately address a fuel spill on trust property leased to Mini–Mart for a convenience store and gas station and paid beneficiary Ted Miracle more for services the bank hired him to perform for the trust than his services were worth. Wells Fargo answered the amended complaint by generally denying the claims and asserting, among other affirmative defenses, it was exempt from liability under the terms of the trust because it acted in good faith.

[¶ 9] After the beneficiaries filed the initial complaint but before they filed the second amended complaint, the trust terminated by its own terms on June 23, 2003. Wells Fargo liquidated the stocks and other securities and distributed $848,000 to the beneficiaries. Wells Fargo withheld $120,000 to cover expenses and continued to hold two parcels of trust real estate—the land leased to Mini–Mart on which the fuel spill occurred and the undeveloped 6.7 acre piece of property affected by the drainage problem. In their second amended complaint, the beneficiaries added the claim that Wells Fargo breached its fiduciary duty by holding trust assets after the trust terminated, including the $120,000 and the two parcels of trust property.

[¶ 10] In 2005, a bench trial was held on the beneficiaries' claims. After the trial, the district court issued a twenty-eight page decision letter. In summary, the trial court found the second amendment to the trust superseded the original trust agreement. Because the second amendment did not contain a good faith exemption from liability clause, the trial court concluded, Wells Fargo was not exempt from liability for actions taken in good faith. Instead, the trial court held the trustee owed the beneficiaries a fundamental fiduciary duty of loyalty which included the duty to exercise the care and skill a person of ordinary prudence would use in dealing with his or her own property. Applying that duty to the beneficiaries' claims, the trial court concluded Wells Fargo breached its fiduciary duty by failing to obtain the best price for the five lots sold to Quality Stores, ensure the fuel spill on the property leased to Mini–Mart was remedied and correct the drainage problem affecting trust property. The trial court also found the trustee breached its fiduciary duty by paying beneficiary Tim Miracle more for services than they were worth and retaining $120,000 in trust funds for legal fees and expenses.

[¶ 11] The trial court awarded judgment to the beneficiaries in the amount of $330,000 (the difference between the sale price and market value of the five lots sold to Quality Stores) together with post judgment interest at the rate of ten percent, plus $7,500 (the beneficiaries pro rata share of the commis-

---

1. The second amended complaint alleged breach of the duties of loyalty, impartiality, prudent administration, giving personal attention to and not delegating trust matters, accounting to the bene-ficiaries, controlling and protecting trust property, investing trust property, carrying out the terms of the trust and exercising special skills to administer the trust.

sion paid to Tim Miracle), and the $120,000 retained by Wells Fargo as legal fees and expenses. The trial court also ordered Wells Fargo to take any and all action necessary to clean up the fuel spill on the leased property in the event neither the State of Wyoming [2] nor Mini–Mart accepted the responsibility. Addressing the drainage problem, the trial court ordered Wells Fargo, which conceded it was responsible for correcting the problem, to obtain and implement an engineering plan within ninety days to mitigate drainage from the Quality Stores' lots.[3] The trial court awarded the beneficiaries their costs, but declined to award attorney fees.

## STANDARD OF REVIEW

[¶ 12] In considering trust agreements, we have said:

The meaning of a trust instrument is determined by the same rules that govern the interpretation of contracts. The intent of the settlor is determined, if possible, from the trust document itself. The determination of whether the agreement is ambiguous on its face does not require extrinsic evidence and is therefore a question of law which we review *de novo*. The interpretation of an unambiguous trust instrument likewise does not require consideration of evidence and is reviewed *de novo*. The interpretation of an ambiguous instrument is a mixed question of law and fact, which will be reversed only if it is clearly erroneous or contrary to the great weight of the evidence.

*Woods v. Wells Fargo Bank Wyoming*, 2004 WY 61, ¶ 42, 90 P.3d 724, 736–37 (Wyo.2004) (citations omitted).

[¶ 13] We have stated the standard of review for factual findings of a judge as follows:

2. Evidence was presented showing the State of Wyoming would handle the cleanup if the contamination resulted from leaking tanks or underground pipes, but not if it resulted from a spill.

3. The evidence showed Quality Stores did not follow its own engineering plan after purchasing the five lots from the trust resulting in excessive runoff from its parking lot. The water ran down an undedicated street owned by the trust, onto the trust's 6.7 acres of undeveloped property and property at the bottom of the street formerly

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. Findings may not be set aside because we would have reached a different result. Also, in reviewing a trial court's findings of fact, we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it

*Fraternal Order of Eagles Sheridan Aerie No. 186, Inc. v. State ex rel. Forwood*, 2006 WY 4, ¶ 24, 126 P.3d 847, 857 (Wyo.2006) (citations omitted).

## DISCUSSION

### Wells Fargo's Appeal

#### 1. The Good Faith Provision

[¶ 14] Wells Fargo contends the trial court erred when it did not enforce the provision of the original trust agreement exempting the trustee from liability for good faith acts or omissions. Pursuant to that provision, Wells Fargo asserts it had no liability to the beneficiaries absent a showing it failed to act in good faith in carrying out its duties as trustee. Wells Fargo argues the trial court's

owned by the trust but purchased by another buyer. There was also evidence of a plan to deed the street to the Town of Evansville, in which case the town would address the drainage problem. At the time of trial, however, the street had not been deeded to the town. The trial court's order provided Wells Fargo was not required to mitigate the drainage problem if within ninety days the street was deeded to Evansville and the town agreed to correct it.

conclusion that the second amendment rewrote the trust to such an extent the good faith clause was not carried over is contrary to the plain language of the amendment, which clearly stated it was intended to supplement and modify the original trust "to the extent specified." Because no language in the second amendment altered or deleted the good faith provision, Wells Fargo asserts, the second amendment did not modify that provision.

[¶ 15] The beneficiaries contend the trial court correctly concluded the amendments wrote the good faith exemption out of the trust. They argue the plain and ordinary meaning of the language of the 1974 amendment showed the grantors intended the amendment to "supersede" the original trust. Thereafter, the 1976 amendment further demonstrated the grantors intent to replace the original trust because it altered the trust agreement in every important respect, including the terms, conditions, obligations, rights, duties, powers and beneficiaries. Of particular significance, the beneficiaries argue, the amendment removed the earlier limitations on the trustee's authority to act only with the direction of the grantors. Given this change, the beneficiaries argue, the good faith exemption was no longer appropriate and the grantors clearly intended to supplant it.

[¶ 16] In accordance with the applicable standard of review, we begin our analysis by considering *de novo* the plain language of the trust documents. We construe the language in the context in which it was written, looking to the surrounding circumstances, the subject matter, and the purpose of the trust to ascertain the intent of the parties at the time the agreement was made. *Carlson v. Flocchini Invs.*, 2005 WY 19, ¶ 15, 106 P.3d 847, 854 (Wyo.2005); *Hickman v. Groves*, 2003 WY 76, ¶ 7, 71 P.3d 256, 258 (Wyo.2003).

### a. The Original Trust Agreement

[¶ 17] The original trust document created the trust, set forth its purpose, identified the trust property, designated the trustee and enumerated the trustee's powers. In exercising the enumerated powers, the trustee was subject to the following limitation:

> During the lifetime of [the grantors], the Trustee shall exercise the foregoing powers and particularly the power of sale of assets constituting a corporate trust only in accordance with the written directions of the Grantors.

In the event the grantors did not jointly instruct the trustee or give identical instructions, the trustee was empowered to act in its discretion as it deemed in the best interests of the grantors. Otherwise, during the grantors' lifetimes, the agreement required the trustee to follow their instructions and provided:

> [the trustee] shall not be liable for depreciation or loss incurred by reason of sales, exchanges, purchases or other action taken pursuant to such directions or by reason of inaction on its part should the Grantors fail to give such directions.

The plain language of this provision reflects that the grantors intended the trustee would not be liable for actions taken or not taken pursuant to their directions.

[¶ 18] Upon the death of one of the grantors, the trustee and the surviving grantor had the authority under the original agreement to dispose of the trust assets "at any time and from time to time." Upon the death of the second grantor, the trustee was directed to distribute the assets to the beneficiaries or sell the assets and distribute the proceeds. The determination as to whether to distribute the assets or sell them and distribute the proceeds was left to the trustee's sole discretion. In a separate paragraph, the original trust agreement provided the trustee was to use its best judgment in exercising the powers conferred and, "in order to feel free in doing so," was exempt from liability for actions "taken or omitted in good faith." The plain language of the original trust clearly reflects the grantors' intent that the trustee be free from liability for actions taken in accordance with their instructions and otherwise so long as it acted in good faith.

### b. The 1974 Amendment

[¶ 19] By its express terms, the 1974 amendment was intended to clarify the origi-

nal trust agreement in two respects: first, to identify the beneficiaries, which the original trust inadvertently did not do, and, second, to change the directives concerning disposal of trust property upon the death of the grantors. In regard to the latter clarification, while the original trust authorized the trustee and surviving grantor to dispose of trust assets "at any time and from time to time" after the death of one grantor, the 1974 amendment expressly directed the surviving grantor and trustee instead to distribute any net income received by the trust by the end of each calendar year following the grantor's death.

[¶ 20] Upon the death of the second grantor, the original trust required the trustee to distribute the assets in kind to the beneficiaries or, in its sole discretion, sell the assets and distribute the proceeds. The 1974 amendment changed the language of that provision to require the trustee to "give careful attention to the timeliness of liquidating any and all property remaining in the trust" either by selling it and distributing the proceeds or distributing the property in kind, whichever the trustee concluded in its judgment was in the best interest of the beneficiaries. In the event the trustee decided to sell the property and distribute the proceeds, the amendment required the trustee to provide the beneficiaries notice and an opportunity to be heard. As in the original trust agreement, however, the amendment left the ultimate decision whether to sell or distribute the property in kind after the grantors' deaths within the trustee's sole discretion. The 1974 amendment to the trust agreement made no mention of trustee liability.

[¶ 21] The beneficiaries argue the 1974 amendment by its own terms superseded the original trust agreement, thereby extinguishing the exemption from liability provision. We disagree. In interpreting a contract, our primary purpose is to determine the true intent and understanding of the parties at the time and place the contract was made. *Hickman,* ¶ 6, 71 P.3d at 257–58. We construe the contract as a whole, attempting to avoid a construction which renders a provision meaningless. *Id.* We strive to reconcile by reasonable inter-

pretation any provisions which apparently conflict before adopting a construction which would nullify any provision. *Id.*

[¶ 22] Despite use of the term "superseded" in the amendment, the grantors' express purpose was to clarify the original trust, not to create a new trust taking the place of the original. The opening paragraph of the amendment references the original trust. The third paragraph requests the trustee to accept the document "as an amendment to said trust agreement ... to the following extent...." The next two paragraphs expressly change the original trust provisions concerning distribution of the assets upon the death of one and then both of the grantors. The remaining paragraphs clarify the original trust by identifying the beneficiaries. The closing paragraph provides the amendment "shall be attached to the original trust agreement so as to become a part thereof." To ignore these provisions and focus exclusively on the term "superseded" would be to nullify much of the plain language of the amendment. Construing the term "superseded" as applying only to those provisions expressly changed by or in direct conflict with the amendment gives meaning to that term while at the same time effectuating other provisions indicating the amendment was intended to add to, rather than replace, the original trust document.

[¶ 23] Considering the amendment in its entirety, the clear intent of the grantors was to amend the original trust to the extent provided. As a matter of law, the 1974 amendment did not supersede or take the place of the original trust but added to it to the extent provided. An amendment or modification to an agreement leaves intact those provisions of the original agreement not expressly or impliedly superseded. *O'Donnell v. Blue Cross Blue Shield of Wyoming,* 2003 WY 112, ¶ 13, 76 P.3d 308, 313–14 (2003). Because the amendment did not expressly or impliedly change the exemption from liability provisions contained in the original trust, they remained intact after the 1974 amendment.

### c. The 1976 Amendment

[¶ 24] The 1976 amendment, like the 1974 amendment, referenced the original trust. It also referenced the 1974 amendment. The 1976 amendment stated it amended, supplemented and modified the original trust as amended "to the extent specified and provided herein." The express purpose of the 1976 amendment was to make the trust irrevocable and provide for the disposition of trust income by the trustee, management of trust property and termination of the trust. Like the first amendment, the second amendment did not specifically refer to the exemption from liability provisions contained in the original trust. The trial court concluded the second amendment changed the original trust so significantly that it essentially *rewrote* the trust and the good faith exemption from liability clause was not carried over. Because our review is *de novo*, we give no deference to the trial court's conclusion. *Mueller v. Zimmer*, 2005 WY 156, ¶ 35, 124 P.3d 340, 359 (Wyo.2005).

[¶ 25] There is no question the second amendment expanded the authority of the trustee. Unlike the original trust, the second amendment contained no provision limiting the trustee during the grantors' lifetimes to acting only in accordance with their written directions. Rather, the second amendment gave the trustee uncontrolled discretion to determine how much of the net income to pay to or apply for the use of the beneficiaries.[4] It also gave the trustee broad authority to make decisions concerning trust property, including the authority to repair, build and make improvements, enter into lease agreements, employ and compensate accountants, attorneys, rental agents and other specialists necessary to administer the trust, obtain insurance, borrow money and negotiate sales. Although the second amendment appointed special trustees with whom the trustee was required to confer concerning income distribution, the amendment provided the trustee was not bound by their wishes, recommendations or demands. The amendment limited the special trustees' power to make decisions without the consent of the trustee to expenditures less than $50,000 and leases for less than five years. All other decisions were required to be submitted to the trustee in writing for its approval.

[¶ 26] Like the first amendment, the second amendment did not reference the exemptions from liability contained in the original trust agreement. The second amendment did, however, add a new provision concerning trustee liability. Paragraph 5(e) of the amendment stated:

As a condition to acceptance by the trustee of any designation as trustee hereunder, it is expressly understood and agreed that the trustee shall have no responsibility or liability for any sale, exchange, expenditure, contract, commitment, obligation or liability of any kind authorized or undertaken by the special trustees either of them, either within or beyond the authority granted them hereunder, and the special trustees hereby jointly and severally agree, individually and on behalf of their respective heirs, successors and assigns, to wholly indemnify the trustee and hold it harmless from and against the claims of any and all persons whomsoever asserting any claims against the trust or the trustee for any interest in the income or principal of the trust or for mismanagement, lost opportunities, or any other basis for any claim of any kind or for any liability which could be imposed upon the trustee by virtue of actions or omissions of the special trustees or either of them, including any imprudent act or the consummation of a transaction which results in any claim against the trust. The indemnity shall extend to the claims of any person ever having a right to receive any income or principal hereunder and any credit or

4. Neither party raises the point, but at the time the 1976 amendment was written, the grantors were nearing the end of their lives. Floyd Miracle died in 1980, Clifton Lierd in 1981. This may have been an important factor in the 1976 amendment, particularly in regard to the increased authority and discretion granted to the trustee. With the grantors' deaths, the provision in the original agreement limiting the trustee's power to act without their written direction was no longer practicable. Provision had to be made giving some other party full authority to act on behalf of the trust.

claimant of the special trustees or the trust.

The plain language of this provision shows the grantors considered trustee liability in the course of drafting the 1976 amendment. In adding the new provision, however, the grantors gave no indication they intended the later exemption to replace the earlier provisions. The 1976 provision exempted the trustee from liability for acts of the special trustees. The earlier provisions exempted the trustee from liability for acts taken at the direction of the grantors and for acts otherwise taken or omitted in good faith.

[¶ 27]   We find nothing in the language of the trust documents, the context in which they were written or the surrounding circumstances to suggest the grantors expressly or impliedly intended the later provision or the amendment in general to supersede the earlier provisions. The later provision is not in conflict with the earlier provisions such that the three provisions cannot stand together nor does the later provision raise the legal inference of substitution since it addresses trustee liability in a different context than the earlier provisions. We hold the original trust provision exempting the trustee from liability for acts taken or omitted in good faith remained intact.

[¶ 28]   In reaching this result, we find determinant the express language of the 1976 amendment stating the grantors desired to "further amend" the original agreement and "hereby amend, supplement and modify" the original trust as amended "to the extent specified and provided herein." The plain meaning of this language is that the amendment modified the original trust to the extent provided, not that it supplanted or took the place of the original in its entirety or of particular provisions not addressed by the amendment. Our conclusion that the original exemption from liability provisions remained in effect is also compelled by our rule that an amendment or modification to an agreement leaves intact those provisions of the original agreement not expressly or impliedly superseded. *O'Donnell,* ¶ 13, 76 P.3d at 314–15. We find nothing in the trust documents suggesting the grantors intended to replace the good faith liability exemption.

[¶ 29]   In construing the 1976 amendment as altering the original document so significantly as to supplant it, the trial court was persuaded the grantors must have intended to remove the liability exemption when they granted the trustee unlimited discretion to act on behalf of the trust. The trial court concluded: "Because the Trustee was granted substantial discretion and additional authority, an exculpatory clause is less appropriate than it would have been under the terms of the original trust." We have said: the parties to an agreement are free to incorporate whatever lawful terms they desire, and the courts are not at liberty, under the guise of judicial construction, to rewrite the agreement. *Cathcart v. State Farm Mut. Auto. Ins. Co.,* 2005 WY 154, ¶ 18, 123 P.3d 579, 587–88 (Wyo.2005). Absent some clear indication the grantors intended the 1976 amendment to replace the original trust agreement in its entirety or rescind the good faith provision specifically, we cannot agree with the trial court. The plain language of the amendment states it was intended to modify the original agreement to the extent provided, not to replace it or modify provisions not referenced in the amendment.

[¶ 30]   In addition to the foregoing, our conclusion that the good faith provision remained intact is influenced by other language indicative of the grantors' intent throughout the process of creating and amending the trust. Reading the original trust and the amendments together, we do not find the changes to be quite as substantial as the trial court concluded they were. From the beginning, the trustee was authorized to use its discretion to act or decline to act in accordance with the grantors' instructions in the best interest of the beneficiaries in instances where the grantors did not jointly provide instructions or provided differing instructions. The trustee also was authorized from the beginning to act in its sole discretion upon the death of the grantors to sell the property and distribute the proceeds. In so acting, the trustee was expressly exempted from liability so long as it acted in good faith. The 1974 amendment continued the trustee's discretion with the caveat that the beneficiaries be notified and heard concerning any

decision to sell the property. There is no question the 1976 amendment increased the trustee's authority to act on behalf of the trust. However, the plain language of the documents demonstrates that the grantors intended from the time the trust was created to give the trustee the sole discretion to act under specified circumstances. One of those circumstances was their deaths. With this discretion, the grantors also clearly intended the trustee to be exempt from liability for actions taken or omitted in good faith. We find it significant they did not rescind the exemption when they increased the trustee's authority and added another exemption from liability provision (i.e., for acts of the special trustees).

[¶ 31] We make one additional point concerning the trial court's conclusion. In reaching the result it did, the trial court did not address in its decision letter whether the trust documents were ambiguous and yet it considered, in addition to the writings themselves, extrinsic evidence unrelated to the facts and circumstances surrounding the execution of the document. Specifically, the trial court referenced a letter written by a Wells Fargo trust officer in 1990, fourteen years after the trust was amended, advising the beneficiaries the amendment virtually rewrote the original trust. The trial court also referenced expert testimony presented at trial to the effect that a reasonably trained trust officer would conclude the second amendment was a complete rewrite and replacement of the original trust instrument. Extrinsic evidence can be considered in interpreting an unambiguous contract only to the extent it involves facts and circumstances

surrounding execution of the contract. *Hickman*, ¶ 11, 71 P.3d at 259–60; *Mullinnix LLC v. HKB Royalty Trust*, 2006 WY 14, ¶ 6, 126 P.3d 909, 915 (Wyo.2006).[5] Only when the document is ambiguous do we look to parol evidence to understand the parties' intent. In this case, neither the parties nor the district court identified any ambiguity in the document and, therefore, evidence concerning how a trained trust officer may have interpreted the document should not have been considered.

## 2. Breach of Duty of Good Faith

[¶ 32] Upon concluding the good faith provision did not survive the amendments to the original trust agreement, the trial court applied the reasonably prudent person standard to determine whether Wells Fargo was liable to the beneficiaries. We have said when a trust agreement by express provision relaxes or modifies the standard of care required of a trustee the failure to give effect to such provision is error. *Kerper v. Kerper*, 780 P.2d 923, 931 (Wyo.1989). Our conclusion that the good faith provision remained in effect after the amendments requires application of that standard rather than the prudent person standard to the facts presented. The question for determination was whether or not, based upon the evidence presented, the trustee acted in good faith. Ordinarily, that is a determination for the fact finder. However, considering the record before us, including the complete trial transcript and the trial court's twenty-eight page decision letter, we conclude for reasons of judicial economy the better course in this particular case is for this Court to apply the applicable standard to the facts presented.[6]

---

5. As we discussed in *Hickman*, ¶ 11, 71 P.3d at 259–260, evidence of circumstances surrounding the execution of a contract may always be shown and is always relevant in determining the contracting parties' intent. The term "surrounding circumstances" refers to the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties. Parol evidence, on the other hand, is not admissible to establish contracting parties' intent unless the contract itself is ambiguous. "Parol evidence" refers to prior or contemporaneous collateral agreements of the parties or their understanding of what particular terms in their agreement mean.

6. This is not the only case this Court has resolved in this way. In *Kerper*, the Court held the trial court improperly applied the prudent person standard when the trust imposed a duty of good faith. We then proceeded to apply the proper standard to the record before us. While noting it was a departure from this Court's usual appellate review role, the Court concluded the record would sustain only one conclusion, i.e. that the trustee's administration of the trust was fully consistent with the good faith standard. *Kerper*, 780 P.2d at 931.

We are able to do so because the trial court's decision letter sets forth detailed findings of fact, including its assessment of witness credibility, making it possible for this Court to review without re-weighing disputed evidence.

[¶ 33] Before we can decide whether Wells Fargo breached its duty of good faith, we must determine what the term "good faith" means in the context of a trust. In other contexts, we have defined "good faith" to mean "an honest intention to abstain from taking any unconscientious advantage of another, even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious." *Mayland v. Flitner*, 2001 WY 69, ¶ 16, 28 P.3d 838, 845 (Wyo.2001). We have also defined it as "being honest, lawful intent, and the condition of acting without knowledge of fraud and without interest to assist in fraudulent or otherwise unlawful scheme." *Id.* In the context of the duty of good faith and fair dealing recognized in contracts, we have defined "good faith" in accord with Restatement (Second) of Contracts, § 205, comment a, (1981) as:

faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.

*Scherer Const., LLC v. Hedquist Const., Inc.*, 2001 WY 23, ¶ 18, 18 P.3d 645, 653 (Wyo. 2001); *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 220 (Wyo.1994). We conclude the Restatement definition is applicable in the context of trust agreements, which are subject to the same rules as contracts.[7]

[¶ 34] One other matter requires clarification before we apply the good faith standard to the trial court's factual findings. We must determine whether the grantors intended the good faith limitation of liability to apply to all, or only some, of the trustee's acts. A provision in a trust fixing a standard of care lower than that otherwise required of a trustee is strictly construed. *Kerper*, 780 P.2d at 930. Such limitations on liability do not modify the ordinary fiduciary duties of a trustee except as expressly provided in the trust agreement. *Id.*

[¶ 35] The good faith standard appeared in the original trust agreement in a section identified as: III. *Investment Control*. By itself, the location of the provision suggests the good faith standard was intended to apply only to investment decisions of the trustee. However, the language of the good faith provision was quite broad, and expressly applied to "the powers, discretions and rights conferred by this agreement" and the "duties imposed upon the Trustee by law." The provision further stated the Trustee was "exempt from liability for *any* action taken or omitted in good faith." (emphasis added). In light of the broad language of the provision, we conclude the grantors intended to modify trustee liability in administering the trust generally and did not intend the

---

7. Citing *Kerper*, 780 P.2d at 929, and the Restatement (Second) of Trusts § 2 (1959), the trial court defined the prudent person standard as follows:

The common law duty of loyalty is the fundamental duty from which each more specific trustee's duty is derived. A trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property.

Looking at the definitions, the prudent person test does not appear to impose a higher duty than the good faith standard. The term "good faith" even appears in the definition of the trustee's duty used by some courts and legal scholars. *See for example, Estate of Bonin*, 457 A.2d 1123, 1124 (Maine 1983); *Harris v. McIntyre*, 2000 WL 942559, 2000 Mass.Super. LEXIS 181; George G. Bogert, *Trusts and Trustees*, § 544, at 407–08 (2d ed.1978). Even so, there is general agreement that the common law duty owed by a trustee goes beyond mere "good faith" unless otherwise provided by express terms of the trust. As stated by one court:

Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.

*Malachowski v. Bank One, Indianapolis*, 590 N.E.2d 559, 567 (Ind.1992).

good faith standard to apply only to investment decisions.

[¶ 36] Applying the prudent person standard, the trial court held the trustee breached its duty to the beneficiaries in five ways: 1) by failing to obtain the best price for trust real estate; 2) by failing to ensure a fuel spill on trust property was remedied; 3) by failing to correct a drainage problem on trust property; 4) by paying beneficiary Tim Miracle more for his services than they were worth; and, 5) by retaining $120,000 in trust funds for legal fees and expenses. We address each of these factual determinations separately with regard to whether the good faith standard of "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party" was met.

### a.  Failure to Obtain the Best Price For Trust Real Estate

[¶ 37] At trial, the beneficiaries claimed Wells Fargo sold five lots owned by the trust for less than its market value. They sought to recover the difference between the sale price and appraised value. We paraphrase relevant portions of the trial court's factual findings on this issue as follows:

1. In July of 1999, Casper realtor Betty Luker presented an offer from Quality Stores to Wells Fargo to purchase five lots owned by the trust for $575,000. It is not clear on whose behalf Luker was acting; the written purchase offer was altered to reflect she was an intermediary.

2. Wells Fargo did not accept the purchase offer but signed an agreement with Luker authorizing her to convey a sales price of $655,000 to Quality Stores. Luker obtained an offer from Quality Stores to purchase the lots for $655,000 and Wells Fargo accepted the offer.

3. Wells Fargo's policy manual required the bank to obtain an appraisal within one year prior to the sale of trust property; Wells Fargo did not obtain an appraisal within one year prior to the sale of the five lots.

4. The Wells Fargo policy manual also required: a recommendation to the Trust Oversight Committee for sale of trust property; the trust officer's written approval of the sale of trust property; and, when high risk assets were involved, the Trust Oversight Committee's approval of the sale. The trust officer did not approve the sale in writing and, although Wells Fargo claimed the sale was approved by the Trust Oversight Committee, no records exist to confirm the claim.

5. Wells Fargo did not follow its own policies in selling the five lots.

6. The lack of a current appraisal meant Wells Fargo acted without the benefit of information as to the current market value of the property.

7. Wells Fargo had no other information from which to determine the market value for the five lots; the trust officers involved relied on the price brought to them by Luker. No evidence was presented as to how Luker arrived at the price.

8. Wells Fargo did very little to promote or market the property, having listed the property twice in the early 1990s, distributed fliers once and placed a sign on the property with Tim Miracle's phone number.

9. Wells Fargo sold the trust property without obtaining a current appraisal or testing the market to determine the reasonable value of the real estate.

10. All three Wells Fargo trust officers acknowledged their lack of real estate expertise; however, no expert help was hired. Instead the trust officers relied on Tim Miracle, who admitted he had not been involved in a profitable development, and Betty Luker, without determining on whose behalf she was acting or how she arrived at the selling price for the property.

[¶ 38] Mindful of the rule that factual findings of a trial court are presumptively correct, giving due regard to the trial court's assessment of witness credibility and adhering to the principle that we do not re-weigh disputed evidence, we conclude these findings are supported by the record and are not clearly erroneous. The question for our determination is whether they support the legal

conclusion that Wells Fargo acted or failed to act in good faith in selling the five lots belonging to the trust. Because the facts demonstrate Wells Fargo did not act in a manner conducive to obtaining a market value price for the property and we can assume the common purpose and justifiable expectations of the parties was to do so, we hold the findings of fact are sufficient to demonstrate Wells Fargo did not act in good faith in carrying out the sale.[8] In failing to obtain a current appraisal, market or promote the property, obtain approval of the sale from the trust oversight committee or employ real estate experts to assist with the sale, Wells Fargo as a matter of law did not act faithfully to the agreed purpose of the trust or the justified expectations of the beneficiaries.

[¶ 39] On appeal, Wells Fargo claims the trial court erred as a matter of law because it did not make a finding as to whether the sale was a market value sale and applied *Allard v. Pac. Nat'l Bank*, 99 Wash.2d 394, 663 P.2d 104 (1983) rather than this Court's holding in *Rock Springs Land and Timber v. Lore*, 2003 WY 100, 75 P.3d 614 (Wyo.2003). Wells Fargo also claims the trial court's factual finding that the market value of the property was $985,000 was clearly erroneous. We address the claimed error in application of *Allard* first.

[¶ 40] In *Allard*, the Washington court held a trustee breached its fiduciary duty in failing to obtain the best price possible for trust property either by obtaining an independent appraisal of the property or by testing the market to determine what a willing buyer would pay. Wells Fargo contends this holding is contrary to this Court's holding in *Rock Springs Land and Timber*, ¶ 17, 75 P.3d at 621 where we stated:

> The standard governing the trial court's consideration of the request to confirm the sale should be whether the trustee was acting in a reasonable and prudent manner at the time the agreement was executed, not whether it had obtained the highest price possible.

[¶ 41] We do not agree with Wells Fargo's reading of the *Allard* court's holding. The bottom line in *Allard* was that by failing to obtain an independent appraisal or testing the market to determine what a willing buyer would pay, the trustee breached the duty imposed upon it by the express terms of the trust, i.e., to exercise the care a prudent person would exercise in the management of his or her own affairs. That is not inconsistent with our holding in *Rock Springs Land and Timber* which dealt with the standard that should apply when a third party is attempting to set aside a sale made by the trustee. Furthermore, in light of our holding in the instant case that the good faith provision governed Wells Fargo's conduct, neither *Allard* nor *Rock Springs* is directly on point.

[¶ 42] Wells Fargo also asserts the trial court erroneously found the market value of the property was $985,000, the amount at which the beneficiaries' appraiser valued the property. In addition to citing its own expert's appraisal value of $637,000, Wells Fargo cites evidence to the effect that other more appealing property in the immediate area was appraised at or sold for less. In accepting the beneficiaries' appraisal value, the trial court made extensive factual findings, which we summarize as follows:

1. A significant factor in appraisals is the selection of comparable sales to determine the value of property.

2. The appraisals offered by the parties differed in their selection of comparable sales.

3. The beneficiaries' appraiser used six comparable sales, two of which took place after the Quality Stores sale and four of which preceded the Quality Stores sale. The four included three sales within the same subdivision as the Quality Stores sale and one on property immediately adjacent to the trust property sold to Quality Stores.

4. Wells Fargo's appraiser used only two comparable sales neither of which was in the same addition as the trust property. The comparable sale geographically closest

---

8. We would have reached the same result applying the prudent person test. Under either the common law duty or the good faith duty imposed by the express terms of the instant trust, the record supports the conclusion that Wells Fargo breached its duty.

was property not subdivided at the time of the sale. The appraiser used the pre-subdivision value. Immediately after the sale, the property was subdivided and the value increased significantly. The post-subdivision value of the comparable sale would appear to be more similar than the pre-subdivision value used by the appraiser. The second comparable sale was on the west side of Casper and removed from an interstate; the trust property was on the east side and adjacent to I–25. The court finds the comparables in the beneficiaries' appraisal were more similar to the trust property than Wells Fargo's appraisal comparables and more indicative of market value.

5. Wells Fargo's appraiser was critical of the beneficiaries' appraiser for appraising the property as five lots rather than a single parcel. The beneficiaries' appraiser defended his appraisal by stating this provided more flexibility and thus a higher value. The flexibility comes from the fact that the lots could be sold as one parcel, separate lots or a combination of lots. His opinion was supported by the testimony of an experienced Casper real estate broker and developer. The court accepts the logic of the beneficiaries' appraiser as being more persuasive.

6. In using a discounted cash flow method to value the property, Wells Fargo's appraiser used a discount rate of 15% derived from data pertaining to the Front Range. When asked how the discount rate would change when applied to Casper, he stated the appropriate discount rate would be above 10.75% and would probably fall in the midrange between 11–20%. For these additional reasons, the court rejects the cash discount flow appraised value.

7. The beneficiaries' appraisal was done closer in time to the actual sale. Wells Fargo's appraiser conceded the closer in time to the actual event an appraisal is, the more accurate it tends to be. The beneficiaries' appraisal was more consistent with other evidence received and was buttressed by trust records kept by Wells Fargo. The court finds the beneficiaries' appraisal to be more credible. Based on this appraisal, the court finds Wells Fargo sold the 5 lots for less than fair market value.

8. Additionally, there is evidence that the low price of the property was obtained because Wells Fargo failed to properly develop and sell the real estate. The three trust officers involved with the trust conceded they were not experts in the area but had the ability to hire professionals to assist in development and sale of the property. No expert was ever hired. Instead, they relied on beneficiary Tim Miracle, who admitted he had not been involved in a successful profitable development, and Betty Luker, without determining on whose behalf she was acting or how she determined the sale price. The combination of all these facts and the lack of current appraisal resulted in a sale for less than fair market value. As a result of the improper sale, the beneficiaries were damaged in the amount of the difference between the sale price and their appraisal value.

[¶ 43] A finding is clearly erroneous when, although there is evidence to support it, this Court upon review of all of the evidence is left with the definite and firm conviction that a mistake was made. *Carlson*, ¶ 10, 106 P.3d at 852. The parties presented two appraisals valuing the trust property. They also presented evidence of sales and appraisals of other property in the area. From the evidence before it, the trial court concluded the appraisal obtained by the beneficiaries best reflected the market value of the property. In reaching that conclusion, the decision letter clearly demonstrates the trial court thoughtfully and carefully analyzed the evidence. There is nothing clearly erroneous about the trial court's findings concerning the value of the property.

### b. Failure to Ensure a Fuel Spill on Trust Property was Remedied

[¶ 44] The trial court also held Wells Fargo breached its fiduciary duty by failing to ensure a fuel spill on trust property was remedied. In reaching this result, the trial court made detailed findings of fact which we summarize as follows:

1. On July 21, 1987, Ned Hodder, one of the beneficiaries, wrote to Wells Fargo advising that over 200 gallons of diesel fuel had been spilled on property owned by the trust and leased to Mini–Mart for a convenience store. Mr. Hodder repeated his concerns to Wells Fargo on April 12, 2000. Mini–Mart conducted an investigation and confirmed the presence of hydrocarbon contamination on the site.

2. Wells Fargo did nothing about the concern except to photograph excavation on the site on one occasion and insert a clause in the lease renewal. Otherwise, Wells Fargo relied on the State of Wyoming to address the problem.

3. The Wyoming Department of Environmental Quality confirmed the State would rehabilitate the site at no cost to the owner if the contamination proved to be from a leaking underground tank or pipe or from a combination of a spill and leak. If the contamination originated from a surface spill, however, the State would not pay for remediation and the cost would fall to the property owner.

4. Wells Fargo policies required the bank to keep a list of problem properties, including those where a spill, leak or other contamination occurred. The policies further required Wells Fargo to take whatever action was necessary to address the problem if it was one requiring immediate environmental attention.

5. Wells Fargo took no action to address the contamination problem on trust property despite its obligation to do so. If neither the State nor the current lessee remediate the property within a reasonable time, then Wells Fargo is responsible for taking all action necessary to remediate.

[¶ 45] On appeal, Wells Fargo claims the trial court did not have subject matter jurisdiction over the contamination issue. Citing Wyo. Stat. Ann. § 35–11–1428(b) (LexisNexis 2005) of the Wyoming Environmental Quality Act, Wells Fargo asserts the beneficiaries were required to serve the attorney general for the State of Wyoming with a copy of their complaint against Wells Fargo. The statute provides in relevant part as follows:

§ 35–11–1428. **Uses of financial responsibility account monies.**

* * *

(b) The attorney general shall be served by certified mail return receipt requested with a copy of the complaint filed in any suit initiated against an owner or operator for third party property damage or personal injury. Service of the complaint on the attorney general is a jurisdictional requirement in order to maintain the suit.

* * *

The bank claims this is "a suit initiated against an owner or operator of an underground storage tank for third party property damage or personal injury" and, under § 35–11–1428(b) service of the complaint on the attorney general is a jurisdictional requirement in order to maintain the suit.

[¶ 46] The fallacy in Wells Fargo's argument is that this is not a suit initiated against an owner or operator of an underground storage tank for third party property damage or personal injury. Rather, this is a suit initiated by the beneficiaries of a trust against the trustee for breach of its duties under the trust, including the duty to act in good faith with respect to trust property. Section § 35–11–1428(b) does not apply to this proceeding.

[¶ 47] Wells Fargo also argues Wyo. Stat. Ann. § 35–11–1802 (LexisNexis 2005) of the Wyoming Environmental Quality Act applies to protect it from liability for failing to remedy the fuel spill. That statutory provision states:

§ 35–11–1802. **Immunity for innocent owners.**

(a) An innocent owner is not liable for investigation, monitoring, remediation or other response action regarding contamination attributable to a release, discharge or migration of contaminants on his property.

(b) To be eligible for immunity under this act, the person shall:

(i) Grant to the department or to a person designated by the department reasonable access to the land for purposes of investigation, monitoring or remediation;

(ii) Comply with any requirements established by the department that are necessary to maintain state authorization to implement federal regulatory programs;

(iii) Not use the real property in a manner that causes exposure of the public to harmful environmental conditions; and

(iv) Comply with any engineering or institutional controls applicable to the real property.

Wells Fargo's argument in this regard suffers from the same failure of reasoning as the immediately preceding argument. Beneficiaries under a trust brought this action against the trustee for breach of its duty under the trust documents. The statutory immunity provision has no bearing on the agreement entered into between the grantors of the trust and the trustee.

### c. Failure to Correct Drainage Problem

[¶ 48] The trial court held Wells Fargo breached its fiduciary duty by failing to correct a drainage problem on trust property. We summarize the trial court's factual findings on this issue as follows:

1. The property held in trust includes Texas Street, an undedicated street. Runoff water flows down the street onto 6.7 acres of undeveloped trust property and another property owner's land at the bottom of the street, creating a drainage problem.

2. Wells Fargo conceded there was a drainage problem and it had some responsibility to fix it. However, Wells Fargo asserted Texas Street was planned to be deeded to the Town of Evansville and the Town would address the problem.

3. At the time of trial, Evansville had not accepted the street nor had the town agreed to correct the drainage problem.

4. Wells Fargo's own policies and the trust agreement required the bank to act to protect trust property. In failing to act to correct a problem for which it concedes it has been responsible since 1999, Wells Fargo failed to fulfill its duty as trustee.

5. Since it failed to take action to correct the problem during the life of the trust,

Wells Fargo bears the responsibility to do so. The bank is ordered to develop a plan by an engineer licensed by the State of Wyoming to mitigate the drainage problem and to implement the plan within 90 days unless within that time Texas Street is deeded to and accepted by the Town of Evansville and the municipality commits to address the problem, in which case Wells Fargo is relieved of this obligation.

[¶ 49] Based upon our review of the record, these factual findings are not clearly erroneous and were sufficient to support the conclusion that Wells Fargo breached the duty of good faith by failing to take any action at all to fix the drainage problem on trust property. In failing to do so, Wells Fargo did not act faithfully to the agreed purpose of the trust or in accordance with the justified expectations of the beneficiaries.

[¶ 50] Wells Fargo contends the trial court erred in ordering it to mitigate the drainage problem at its expense. In making this claim, the bank asserts if it had addressed the problem when it arose prior to termination of the trust, the expense related to the repair would have been charged to the trust and it was improper after termination of the trust for the trial court to charge the bank with the expense. Wells Fargo's argument has merit. Although, the bank did not address the problem during the life of the trust, there was no evidence presented that the delay in correcting the drainage issue caused any additional damage. Unless the bank's failure to act in a timely fashion, in and of itself, caused the beneficiaries damage, simply directing the bank to correct the drainage problem at this time sufficiently addresses the beneficiaries' claims. Had the bank performed its duties during the life of the trust, the cost of doing so would have been borne by the trust. Neither of the parties, or our own research, has identified any basis upon which the trustee can now be held liable for those costs. Given the trial court's factual findings and conclusion, we find no error in the order requiring Wells Fargo to correct the drainage problem, assuming the cost of doing so is borne by the trust, not by Wells Fargo.

#### d. Overpayments to Beneficiary Tim Miracle

[¶ 51] Wells Fargo claims the trial court erred in finding it improperly paid $10,000 to Mr. Miracle. Regarding that payment, the trial court found Mr. Miracle received $10,000 for the sale of trust property to Applebee's; there was no indication the beneficiaries were told of this payment and so they did not have the opportunity to approve, object to or receive an explanation for it as was the case with other payments; there was little or no evidence to justify the payment; and one beneficiary testified he was told fees would be paid only to licensed real estate professionals, which Mr. Miracle was not. Having reviewed the evidence on this issue, we do not find these factual findings clearly erroneous. It is reasonable to assume that the beneficiaries would be justified in expecting the trust would not expend funds without obtaining a corresponding benefit. We conclude, on the basis of the evidence in the record, Wells Fargo did not act in good faith in making the payment of $10,000 to Mr. Miracle.

#### e. Retention of $120,000 in Trust Funds

[¶ 52] Wells Fargo contends the trial court erred in ruling it improperly withheld $120,000 of trust funds to cover attorneys' fees and costs associated with defending the claims made by it against by the beneficiaries in this case. Wells Fargo claims it informed the beneficiaries the $120,000 was being retained not only to cover litigation expenses but for other costs relating to the trust, closing expenses and contingent liabilities. Wells Fargo asserts the trial court did no analysis and provided no opinion as to whether the trustee could properly retain funds for expenses unrelated to the instant case. If the trial court had considered that question, Wells Fargo contends, it would have concluded the bank properly withheld funds to cover contingent liabilities associated with the trust property still held by the bank and the drainage problem on Texas Street.

[¶ 53] The beneficiaries respond that Wells Fargo initially stated it was withholding the funds to reimburse the bank for attorneys' fees and litigation expenses incurred in defending this action. They assert that Wells Fargo changed its theory and claimed it was entitled to the funds for other expenses only after the trial court ruled the bank was not entitled to retain funds for litigation expenses.

[¶ 54] In its decision letter, the trial court stated: "The Bank contends that these monies [the $120,000] may be properly withheld to reimburse their attorney fees and costs incurred to defend this lawsuit." The trial court concluded:

> To allow recovery of attorney's fees in this case would permit invasion of the Trust corpus for an unwarranted purpose, where the litigation has conferred no benefit on the Trust. Plaintiffs' complaint alleged malfeasance. The resulting trial was for the personal protection of the bank. It cites no authority to justify recovery [of] its legal fees and expenses from the trust fund. Therefore, its retention of ' the $120,000 was·improper.

Clearly, the trial court's understanding was Wells Fargo retained the funds to cover legal fees and costs incurred in defending the claims alleged in this lawsuit. Although Wells Fargo claims in its appellate brief it informed the beneficiaries by correspondence it was holding the funds to cover litigation costs and "closing expenses and contingent liabilities," the bank fails to cite to the record to support the claim. Absent a showing the argument was properly made to the trial court, we affirm the trial court's ruling to the extent it held Wells Fargo was not entitled to withhold trust funds to cover costs associated with this litigation.

[¶ 55] However, the trial court's order made Wells Fargo the "guarantor" for remediation of the fuel spill and the drainage problem that occurred during the life of the trust. In other words, in the event other potentially responsible parties—i.e. the State of Wyoming, Mini–Mart or the Town of Evansville—did not act to remedy the problems, the trial court's order made Wells Fargo responsible for ensuring the problems were corrected. Wells Fargo was entitled to use trust funds to carry out this portion of the trial court's order unless the trustee's delay

increased those costs. To that extent, the trial court was justified in holding Wells Fargo responsible. To the extent the trial court's holding required Wells Fargo to be responsible for the costs associated with remedying the fuel spill and drainage problem, we reverse. Wells Fargo was entitled to retain trust funds to cover expenses incurred in remedying the fuel spill and drainage problem.

### The Beneficiaries' Cross–Appeal

#### 1. Attorney fees

[¶ 56] In their cross-appeal, the beneficiaries claim the trial court erred in declining to award attorney fees. The trial court noted in its decision letter the beneficiaries' claim that other jurisdictions have awarded attorney fees in cases holding a trustee acted improperly in administering the trust. The trial court stated: "Wyoming has not recognized the exception urged by the [beneficiaries]. If this additional exception is to become the law of Wyoming, it should occur through decision of the Wyoming Supreme Court or by legislative fiat." On that basis, the trial court applied the American rule, which generally requires each party to pay his own attorney fees and costs absent an express statutory or contractual provision authorizing an award or circumstances of fraud and an award of punitive damages. Finding none of these exceptions applied, the trial court ordered the parties to pay their own attorney fees and costs.

[¶ 57] On appeal, the beneficiaries acknowledge Wyoming generally follows the American rule for recovery of attorney fees. Citing Snodgrass v. Rissler & McMurry Co., 903 P.2d 1015 (Wyo.1995) and Alexander v. Meduna, 2002 WY 83, 47 P.3d 206 (Wyo. 2002), however, they argue this Court has recognized attorney fees may be appropriate in cases involving fraud, malice, oppression or willful wrong. Citing other authorities, they further argue attorney fees are appropriate in cases where a trustee is involved in self-dealing and breaches its fiduciary duty. 76 Am.Jur.2d Trusts § 736; Hughes, 89 P.3d at 152.

[¶ 58] Three years ago, in Rock Springs Land and Timber, ¶ 37, 75 P.3d at 628, we reaffirmed our precedent holding the American rule applicable in this jurisdiction. Pursuant to that rule, all parties are responsible for their own fees and costs. In reaffirming the rule in Rock Springs Land and Timber, we noted the request for attorney fees was made in that case "without a clear articulation" of the basis for the claim. In contrast, the beneficiaries in the instant case clearly articulate the basis for their claim as one of justice and public policy requiring trustees who commit willful misconduct to be charged with the costs of their wrongdoing.

[¶ 59] In Alexander, ¶ 49, 47 P.3d at 220–21, we affirmed an award of attorney fees based upon the punitive damage exception to the American rule. In Schlesinger v. Woodcock, 2001 WY 120, ¶ 21, 35 P.3d 1232, 1239 (Wyo.2001), and Cline v. Rocky Mt., Inc., 998 P.2d 946, 949 (Wyo.2000), we affirmed attorney fee awards where contracts provided for such an award. In Olds v. Hosford, 354 P.2d 947, 950 (Wyo.1960), we indicated a party may be awarded attorney fees upon showing fraud, malice, oppression or willful wrong in a replevin action. In Snodgrass, 903 P.2d at 1017, we suggested an award of attorney fees might be appropriate in other types of actions where fraud, malice, oppression or willful wrong can be shown. However, we have never ordered payment of attorney fees in a case that did not involve either punitive damages or a statutory or contractual provision for fees. Despite the beneficiaries compelling argument in their cross-appeal, we are not persuaded this is the case in which to move beyond precedent and order payment of attorney fees when punitive damages were not awarded and no contract or statute provides for such fees. We affirm the trial court's order denying the request for fees.

#### 2. Prejudgment Interest

[¶ 60] The beneficiaries also claim error in their cross-appeal in the trial court's refusal to award prejudgment interest. Prejudgment interest is an appropriate element of damages in some cases. Millheiser v. Wallace, 2001 WY 40, ¶ 11, 21 P.3d 752, 755 (Wyo.2001). We have approved the

award of prejudgment interest on liquidated sums in breach of contract actions when the amount due is readily computable by simple mathematical calculation. *Id.* The beneficiaries argue this is an appropriate case for prejudgment interest because the amount owed was readily computable by simple mathematical calculation—that is, the trial court subtracted the sale price from their appraisal value to arrive at the amount owed.

[¶ 61] The beneficiaries misunderstand the applicable test for determining an appropriate case for prejudgment interest. In *United Pac. Ins. Co. v. Martin & Luther Gen. Contractors, Inc.*, 455 P.2d 664, 677 (Wyo.1969), the defendant protested the allowance of prejudgment interest because prior to the entry of judgment there was no fixed and determined amount owed. We agreed, stating a claim requiring a lengthy trial and involving myriad, perplexing problems did not constitute a claim readily computable by simple mathematical calculations. In *Laramie Rivers Co. v. Pioneer Canal Co.*, 565 P.2d 1241, 1245 (Wyo.1977), we clarified that a mere difference of opinion as to the amount due or as to liability does not preclude prejudgment interest if the amount sought to be recovered is a sum certain and the party from whom payment is sought receives notice of the amount sought. In *Laramie Rivers*, the amount sought to be recovered was established prior to entry of judgment by a written billing statement for a fixed amount. This Court remanded the case to district court for determination of when the debtor received notice of the fixed amount claimed.

[¶ 62] In the instant case, the amount sought to be recovered was not a sum certain of which Wells Fargo had notice prior to the trial court's decision. Rather, the amount to be recovered was determined only after a lengthy, complex trial involving extensive and conflicting evidence. We have said an unliquidated claim cannot be converted into a liquidated claim unless the amount claimed can be determined without reliance on opinion or discretion. *Cargill, Inc. v. Mountain Cement Co.*, 891 P.2d 57, 66 (Wyo.1995). The beneficiaries' unliquidated claim in this case became a sum certain only after the trial court considered the opinion testimony of the various witnesses as to the market value of the trust property, weighed that testimony and made a determination on the basis of the evidence as to the amount owed. This was not an appropriate case for prejudgment interest and the trial court's ruling in that regard is affirmed.

## CONCLUSION

[¶ 63] While the trial court applied the incorrect contractual standard to the trustee's actions, the evidentiary record supports the conclusion Wells Fargo did not act in good faith when it failed to take the ordinary steps a trustee should take in selling trust property. The trial court's finding that Wells Fargo's breach of its duty of good faith caused damages to the beneficiaries was supported by the record and is affirmed. With regard to remedying the fuel contamination and drainage problems, the trial court's order holding the trustee responsible for accomplishing correction of those problems is affirmed. However, the cost of those efforts should be borne by the trust and paid for with the funds retained by the bank unless the delay in correcting the problems caused additional costs to be incurred. To the extent the delay caused additional costs, the bank must bear those costs. The trial court's order denying interest and attorney fees is affirmed.